Max R. Tarbox (TX 19639950)
TARBOX LAW, P.C.
2301 Broadway
Lubbock, Texas 79401
Phone: 806.686.4448


Stephen A. McCartin (TX 13374700)
Barry Golden (TX 24002149)
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201-4761
Telephone: 214.999.3000


**COUNSEL FOR WALTER O'CHESKEY,
TRUSTEE OF THE AHF LIQUIDATING
TRUST**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| **American Housing Foundation,** | § | |
| Debtor. | § | Case No.: 09-20232-RLJ |
| | § | |
| **Walter O'Cheskey, Trustee,** | § | |
| Plaintiff, | § | Adversary No. 10-02016-RLJ |
| v. | § | |
| **Robert L. Templeton,** | § | |
| Defendant. | § | |

**TRUSTEE'S FIRST AMENDED COMPLAINT AGAINST ROBERT L. TEMPLETON
TO AVOID GUARANTEES AS FRAUDULENT OBLIGATIONS, TO SUBORDINATE
ALLOWED CLAIMS, AND TO AVOID AND RECOVER FRAUDULENT AND
PREFERENTIAL TRANSFERS, TOGETHER WITH OBJECTIONS TO CLAIMS**

## TABLE OF CONTENTS

I.      Executive Summary .............................................................................................1

II.     Soft-Money-Investor Claims Generally ............................................................4

        A.      WI-HURIKE, LTD. ...............................................................................7

        B.      LIHTC-M2M No. 2, LP .........................................................................8

        C.      STUDENT CARE FOUNDATION ......................................................8

        D.      GOZ NO. 1, LTD. ..................................................................................8

III.    Objections to "Soft-Money-Investor" Claims Generally ..................................9

IV.     Jurisdiction and Venue ....................................................................................10

V.      Objection to Templeton Claims ......................................................................11

        A.      GOZ NO. 1, LTD. ................................................................................11

        B.      LIHTC WALDEN II DEVELOPMENT LTD. ....................................12

        C.      WI-HURIKE, LTD. .............................................................................16

        D.      AHF GRAY RANCH, LTD. .................................................................18

        E.      LIHTC-M2M No. 2, LP .......................................................................19

        F.      LIHTC – M2M No. 3, LP .....................................................................20

VI.     Causes of Action ..............................................................................................22

        First Cause of Action – Avoidance of Fraudulent Obligations............................22

        Second Cause of Action – Mandatory Subordination of the Templeton
        Claim...................................................................................................................23

        Third Cause of Action – Equitable Subordination of the Templeton Claim .........24

        Fourth Cause of Action – Avoidance And Recovery Of Fraudulent
        Transfers .............................................................................................................24

        Fifth Cause of Action – Avoidance And Recovery Of Preferential
        Transfers .............................................................................................................25

        Sixth Cause of Action – Disallowance Of Templeton Claim Under 11
        U.S.C. § 502(d) ...................................................................................................26

VII.    Request for Relief ............................................................................................27

Walter O'Cheskey, the trustee of the AHF Liquidating Trust (the "**Trustee**" or "**Plaintiff**") for American Housing Foundation ("**AHF**" or "**Debtor**"), hereby files this *Complaint* (the "**Complaint**") against Defendant Robert L. Templeton ("**Templeton**" or "**Defendant**").[1] In support of this Complaint, the Trustee respectfully states as follows:

# I.
## EXECUTIVE SUMMARY

Summary of Claims and Objections

1.    The Templeton proof of claim asserts claims against AHF related to his equity investments in the following entities:

| Entity | Amount Invested | Summary of Objections |
|---|---|---|
| 1) GOZ No. 1, Ltd. | $ 250,000 | • He gifted his interest to AHF<br><br>• No valid guaranteed investment<br><br>• Abusive Tax Shelter -- $1,174,370 of illegitimate losses K-1 ($924,371 fraudulent Non-Recourse Note utilized) |
| 2) LIHTC Walden II Development, Ltd. | 2,164,345 cash<br>1,335,655 receivables<br>$3,500,000 | • No valid guaranty (only Initial Capital Contribution)<br><br>• Receivables contributed had no value<br><br>• Abusive Tax Shelter-- $3,500,000 of illegitimate losses |

---

[1] The Trustee intends to file a similar complaint against Heron Land Company, an alleged creditor of AHF, that, upon information and belief, is owned and controlled by Templeton.

TRUSTEE'S FIRST AMENDED COMPLAINT AGAINST ROBERT L. TEMPLETON TO AVOID GUARANTEES AS
FRAUDULENT OBLIGATIONS, TO SUBORDINATE ALLOWED CLAIMS, AND TO AVOID AND RECOVER
FRAUDULENT AND PREFERENTIAL TRANSFERS, TOGETHER WITH OBJECTIONS TO CLAIMS                PAGE 1

| | | | |
|---|---|---|---|
| 3) WI Hurike | $ 200,000 | • Not a loan as alleged |
| | | • No guaranteed obligation |
| | | • Abusive Tax Shelter-- $2,513,028 of illegitimate losses on K-1 ($2,513,028 fraudulent Non-Recourse Note utilized) |
| 4) AHF Gray Ranch, Ltd. | $ 250,000 | • No valid guaranty obligation |
| 5) LIHTC M2M No. 2, Ltd. | $ 450,000 | • He gifted his interest to AHF |
| | | • No valid guaranty obligation |
| | | • Abusive Tax Shelter-- $2,244,328 of illegitimate losses on K-1 |
| 6) LIHTC M2M No. 3 Ltd. | $ 200,000 | • No valid guaranty obligation |
| | | • Abusive Tax Shelter-- $200,000 of illegitimate losses on 2008 K-1 |

| | |
|---|---|
| Total invested | $4,600,250 |
| Interest alleged | 449,851 |
| Attorney Fees & Cost | 583,504 |
| Total Claim | $5,433,510 |

2.     Tax structures are complex.  Steve Sterquell ("**Sterquell**") used a complicated tax structure to entice soft-money investors into advancing him money in exchange for (i) repayment of the amount advanced with interest, plus (ii) illegitimate tax deductions.  In essence, he

convinced the "soft-money investors"[2] to loan him money and, in exchange, he promised to (a)

pay them back within one year, (b) provide them up to 18% interest, and (c) provide them with

what are clearly illegitimate tax deductions at least equal to the amount invested and sometimes

several times the amount advanced (sometimes 4 to 12 times the amount invested). The "soft-

money investors" knew or should have known this scheme and resulting tax deductions were

illegitimate and improper.

3.      Accordingly, the Trustee:

    a. Objects to the claims of the soft-money investors asserted
against AHF on various grounds (*e.g.*, the documents do not
support the claims asserted, etc.);

    b. Requests the Court to void the AHF guarantees under
applicable state and federal fraudulent-conveyance statutes
(fraudulent-transfer obligations). AHF usually owned 1% or
less of the partnership that received the funds and therefore did
not receive fair equivalent value for any guaranty obligations
and was insolvent when the guarantees were executed;

    c. Requests the Court condition the award of any equitable relief
upon a showing that the claimant has "clean hands" and has not
been involved in any inequitable conduct;

    d. Requests the Court, if a claim is allowed, to subordinate the
soft-money-investor claims:

        (i) Pursuant to § 510(b) as resulting from the sale or purchase
of a security of an affiliate of AHF, and/or

        (ii) Pursuant to § 510(c) as arising from improper conduct in
participating in the illegitimate tax scheme; and

    e. Seeks the avoidance and recovery of fraudulent and
preferential transfers pursuant to sections 547, 548 and 550 of
the Bankruptcy Code and applicable state law, and

---

[2]   A "soft-money" investment is commonly used to refer to an equity investment not for the purpose of acquiring
real property but rather allegedly to provide temporary funds in support of pre-acquisition and pre-development
expenses (i.e., "soft costs") associated with an expected acquisition, rehabilitation, or refinance of real property.

disallowance of any claims under section 502 of the Bankruptcy Code until such transfers have been returned or repaid.

## II.
## SOFT-MONEY-INVESTOR CLAIMS GENERALLY

4.      There are substantial legitimate unsecured claims against AHF. AHF directly or indirectly owns interests in special purpose entities that own and operate approximately 66 apartment complexes located in nine states ("**SPEs**"). These SPEs were formed for a legitimate business purpose: to provide affordable housing while at the same time providing limited partner/tax-credit partners and AHF with legitimate real-estate-investment opportunities.

5.      While AHF and the tax-credit limited partners were engaged in the legitimate affordable-housing business through the SPEs, Sterquell and certain "soft-money" partners were involved in taking illegitimate tax deductions in return for what were in actuality loans. The following is an example of how the typical "soft-money" investment worked:

> Sterquell would tell his "partners" that if they would "invest" funds in a non-Debtor entity, he would promise to repay the investment within one year, together with 18% per-annum interest, *plus* provide them with tax deductions at least equal to the investment amount and sometimes several times their actual investment (in many instances 4 to 12 times the amount invested). In order to obtain tax deductions of several times the investment, Sterquell and the soft-money investors manufactured "basis" and/or eliminate negative capital accounts to avoid tax on phantom income by executing sham non-recourse notes.

6.      Sterquell attempted to structure this illegitimate tax scheme as follows:

a.    Sterquell would form a limited partnership. An AHF wholly-owned shell entity would usually serve as the general partner.

b.    The investor would then advance funds to the partnership in exchange for a number of things:

(i)    a limited partnership interest;

    (ii)  in some, but not all instances, a partnership promise to return the "capital contribution" within one year together with a "preferred return" of up to 18% per annum;

    (iii)  if the partnership had insufficient funds to return the capital and preferred return, the shell general partner promised to make a contribution to the partnership (which it could never make because it owned no assets and operated no business) so that the partnership could make the promised return; and

    (iv)  in many instances, Sterquell and AHF guaranteed that the partnership would return the funds with interest as promised.

  c.  To obtain tax deductions several times larger than their actual investment, the investor, in many instances, would execute large **_non-recourse_** notes to allegedly evidence the obligation of the investor to make additional capital contributions to the partnership. These non-recourse notes were a fiction since they were payable solely from the partnership's distributions to the investor (which were never expected). Accordingly, neither the partnerships nor the investors ever intended or expected for the notes to be repaid. The notes were executed for the purpose of manufacturing the investor's "tax basis" so that the investor could take large tax deductions on his federal income tax returns and/or to eliminate a negative capital account and tax on phantom income resulting from deducting the large losses. In many instances, the non-recourse notes were falsely back dated to take advantage of previous year losses.

7.    The soft-money structure was designed by Sterquell and participated in by the "soft-money" investors who knew, or should have known, that the investment was purely for illegitimate and improper tax purposes.

## Example: Templeton Investment in GOZ No. 1, Ltd.

8.    One example speaks volumes. Templeton is a large "soft-money" investor who has filed a claim against AHF for over $5 million. Templeton is a sophisticated party. He graduated both college and law school in a combined total of just 4 ½ years. Templeton has made millions running his own law firm and investing in the oil-and-gas business. He formerly

represented AHF as legal counsel on selected matters. Templeton is now chairman of the AHF

Creditors Committee and has directly or indirectly attempted to control the direction of this

complex chapter 11 bankruptcy case.

    9.    Templeton's "investment" in GOZ No. 1, Ltd. ("**GOZ No. 1**") is illustrative of

the illegitimate scheme:

- Templeton advanced $250,000 to GOZ No. 1 in exchange for a 42.5% limited partnership interest in GOZ No. 1;

- The GOZ No. 1 partnership agreement did not provide a promise to return the "capital" within one year (as many partnership agreements did);

- Sterquell and AHF signed a guarantee in which they guaranteed "to pay, when due or declared due as provided in the *Loan Documents*" Templeton's investment (but there are no "Loan Documents," merely a partnership agreement);

- Templeton then either attempted to falsely manufacture additional "tax basis" in the partnership to allow him to take tax deductions of $1,174,371 (4.7 times his actual investment) or attempted to wipe out his negative capital account resulting from taking these tax losses by executing a "Non-Recourse Promissory Note" in the amount of $924,371 ($924,371 + $250,000 original investment = $1,174,371 deduction). This note is payable <u>solely</u> from distributions, if any, from GOZ No. 1 (which, of course, there were never expected to be any). This note was never intended to be paid but rather improperly used to manufacture tax basis so that Templeton could claim illegitimate tax deductions on his federal tax returns.

- To make matters worse, Templeton "gifted" his partnership interest in GOZ No. 1 to AHF in 2008 (and presumably took a gift tax deduction for that transfer). Despite the fact that he no longer owns this interest, Templeton filed a claim in this proceeding asserting he is still owed the $250,000 originally invested in GOZ No. 1, plus interest and attorneys fees of approximately $100,000. Templeton failed to disclose the transfer of his interest to AHF in his proof of claim.

10.    As stated, upon information and belief, this structure led Templeton to take tax deductions of $1,174,371 from his $250,000 investment in GOZ No. 1, which is 4.7 times his investment.  If Templeton's tax rate were 35% in the appropriate year, these deductions saved Templeton $411,029 in taxes.  Accordingly, within the first year and from the illegitimate tax deductions alone, Templeton recovered his initial $250,000 investment in GOZ No. 1 plus an additional $160,000.

11.    The following questions and answers in Templeton's deposition on April 7 and 8, 2010, clearly show that the soft-money entities were used, along with non-recourse promissory notes, to improperly build tax basis to allow soft-money investors to take illegitimate tax deductions on their federal income tax returns:

QUESTIONS RELATED TO TEMPLETON'S INVESTMENTS IN:

A.    WI-HURIKE, LTD.

When asked to explain the Hurike partnership, Templeton answered:

A:  . . . he [Sterquell] conceived this limited partnership of HURIKE – and for the – for the reasons of ability to deduct.  Okay?  And he initially told me he was – that I would receive a million dollar deduction.  Okay.  And that I wouldn't have to put up any money.  And that just sounded – I mean, that just sounded wonderful . . . .

Templeton Depo. at 92:16-24.

A:  . . . and I said, well, what is – you know, what is the deduction that's available on that?  And he says, well, if you'll put up $200,000, I'll allow you another million dollar deduction.  So I put up the 200,000 . . . .

Id. at 93:7-10.

A:  . . . and then . . . I got this K-1 . . . .  It was for $2,513,028 not an even two million.

Id. at 94:3-14.

**B.**     **LIHTC-M2M No. 2, LP**

When asked, "What do you know about LIHTC-M2M?", Templeton answered:

A: I'm not sure I can tell you.[3]

Templeton Depo. at 52:9-10.

**C.**     **STUDENT CARE FOUNDATION**

When asked, "Do you know what that entity [Student Care Foundation] is?", Templeton answered:

A: I don't know what the entity was or what purpose he [Sterquell] had in mind for it.[4]

Templeton Depo. at 87:4-12.

**D.**     **GOZ NO. 1, LTD.**

When asked to explain the $924,371 non-recourse note he executed, Templeton answered:

A: You know, on a couple of these occasions . . . he [Sterquell] prepared a nonrecourse note for *some* tax purpose.  And that may have been one of those nonrecourse notes.

Q: So your investment was shown as $924,371 for tax purposes –

A: I don't know.

Templeton Depo. at 78:11-22 (emphasis added).

Q: And it's your further testimony that you don't actually know the source of the number – in other words, the 924,371 . . . nonrecourse promissory note is not a number that you understand?

A: But where [Sterquell] came up with it and how he arrived at it, Mr. Martinez, I can't tell you.

Q: Do you recall the circumstances under which he told you about this note . . . ?

---

[3] Templeton does not know anything about this limited partnership?  Yet, he invested $450,000 in this entity and owned a 42.5% limited partnership interest therein.

[4] Again, Templeton does not know anything about the partnership?  Yet, he owned 42.5% of GOZ No. 1, Ltd., which owned 66% of Student Care Foundation.

A: He says that's in connection with the transaction and with taxes . . . .

*Id.* at 79:21 – 80:10.

Q: [B]ut did you ever pay that note?

A: No.

Q: Did you ever receive demand to pay that note?

A: No.

Q: So that note would be – still an outstanding nonrecourse indebtedness?

A: [A]n outstanding nonrecourse indebtedness is not an indebtedness you have to pay.  So I don't think I owe the amount of money ...

Q: So this is a promissory note that was strictly created for the IRS?

A: It was created by Steve Sterquell in his plan.  And his plan, you and I can't ask him about now.  Okay? ...

*Id.* at 96:3-22.

## III.
### OBJECTIONS TO "SOFT-MONEY-INVESTOR" CLAIMS GENERALLY

12.     The trustee objects to these "soft-money-investor" claims for one or more of the following reasons:

   a.   In some instances, the partnership agreement does not require the partnership to return the capital within one year as alleged;

   b.   When a partnership agreement does require a return of the capital contribution plus a preferred return within one year, in many instances there are (i) no written AHF guarantees of the partnership's obligation, or (ii) if there is an AHF guaranty, the guaranty constitutes an avoidable fraudulent obligation under the applicable state and federal fraudulent transfer statutes because AHF did not receive fair equivalent value in exchange for the guaranty obligation that it incurred while insolvent;

   c.   If there is an AHF guaranty, the guaranty was obtained in an illegitimate tax scheme and for no valid business purpose and therefore is unenforceable;

d.  The guaranty claim is a claim arising from the sale or exchange of a security of an affiliate of AHF and is subordinated to other legitimate general unsecured claims pursuant to section 510(b) of the Bankruptcy Code; and

e.  The soft-money investors either knew or should have known that they were participating in significant improper conduct, including the improper tax scheme; accordingly, the claims of the soft-money investors are subject to equitable subordination pursuant to section 510(c) of the Bankruptcy Code.

## IV.
### JURISDICTION AND VENUE

13.  On April 21, 2009 (the "**Petition Date**"), certain alleged creditors of AHF filed an involuntary petition against AHF pursuant to chapter 11 and section 303 of title 11 of the United States Code (the "**Bankruptcy Code**") thus initiating the involuntary case [Case No. 09-20232] (the "**Involuntary Case**").[5]   On June 11, 2009, AHF filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code, initiating the voluntary case [Case No. 09-20373] (the "**Voluntary Case**").  On July 17, 2009, the Court entered its *Agreed Order Granting Motion to Consolidate Bankruptcy Cases* [Docket No. 88], consolidating the Voluntary Case and the Involuntary Case into a single case pursuant to Bankruptcy Rule 1015(a).

14.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and (b) and 1334.  This is a core proceeding as defined in 28 U.S.C. § 157(b).  If any part of this adversary proceeding is found to be "non-core" under Bankruptcy Rule 7008, the Trustee consents to the entry of final orders and judgments by this Court.  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

15.  This Complaint is brought in accordance with Federal Rules of Bankruptcy

---

[5] All references to the "Bankruptcy Code" are made to 11 U.S.C. §§ 101 *et seq.*  Unless otherwise indicated, all section references are references to the Bankruptcy Code.

Procedure 7001, *et seq.*, and seeks relief under sections 105, 502(d), 510(b), 510(c), 544, 547(b), 548, and 550 of the Bankruptcy Code and section 24.005 of the Texas Business and Commerce Code.

**V.**

**OBJECTION TO TEMPLETON CLAIMS**

**A.    GOZ NO. 1, LTD.**

16.    Templeton alleges in his proof of claim #76-2 filed on October 7, 2009 (the "**Templeton Claim**") that:

- He invested $250,000 in GOZ No. 1 on or about March 1, 2006;

- He executed a GOZ No. 1 Limited Partnership Agreement (attached as Exhibit I to the Templeton Claim); and

- On March 1, 2006, AHF "executed an unconditional guarantee of the payment obligation contained in the Partnership Agreement" (a copy of the guaranty is attached as Exhibit J to the Templeton Claim).

17.    The Trustee objects to the guaranty claim based on the purported March 1, 2006, Guaranty Agreement attached as Exhibit J to the Templeton Claim for the following reasons:

- The guaranty provides that "Guarantor agrees to pay, when due or declared due as provided in the **Loan Documents**, the Guaranteed Investment to investor . . . ." *See* Exhibit J to the Templeton Claim (emphasis added);

- There are no "Loan Documents." There is only an equity investment in GOZ No. 1; and

- The GOZ No. 1 Partnership Agreement contains **no** provision requiring the GOZ No. 1 partnership to return the $250,000 capital contribution at any time. Likewise, it contains no accrued-interest, preferred-return, or attorney's fee provisions.

18.    Templeton then asserts in the Templeton Claim that, on April 24, 2006, AHF again guaranteed "repayment of the investment" pursuant to the document attached as Exhibit K

to the Templeton Claim.  The March 1 and April 24, 2006 guarantees are collectively referred to herein as the "**GOZ No. 1 Guarantees**."  Templeton is wrong for at least two reasons.  First, Exhibit K in no way, shape, or form constitutes an AHF guarantee of any obligation.  The guaranty references non-existent "Loan Documents," and the Templeton Claim falsely references "interest of $89,671.41" when there is no interest accrued on the limited partnership interests.  Second and most importantly, Templeton has failed to disclose to the Court that he *no longer owns an equity interest in GOZ No. 1*.  He gifted his equity interests in GOZ No. 1[6] – presumably for another tax deduction and associated tax savings – to AHF in 2008.  Templeton cannot claim rights associated with a limited partnership interest that he no longer owns.

Tax Treatment

19.     It appears Templeton was provided a 2007 K-1 form GOZ No. 1 providing him with $1,174,370 of ordinary tax losses.  Templeton only invested $250,000 in GOZ No. 1, so he executed a non-recourse note in April, 2008 (falsely back dated to January 1, 2008) evidencing an alleged promise to make a future capital contribution to GOZ No. 1.  This $924,371 non-recourse note plus his $250,000 capital contribution adds up to almost exactly to the $1,174,370 tax loss.  Templeton was apparently attempting to falsely build tax basis and/or to falsely eliminate a negative capital account and future tax on phantom income resulting from these losses.

**B.     LIHTC WALDEN II DEVELOPMENT LTD.**

Templeton Contributions

20.     In the Templeton Claim, Templeton asserts that he *invested* the following amounts on the following dates in LIHTC Walden II Development, Ltd. ("**Walden II**"):

---

[6] According to GOZ's 2008 Schedule K-1 to Templeton.

| | |
|---|---|
| $2,000,000 | August 31, 2007 |
| $500,000 | January 24, 2008 |
| $1,000,000 | May 15, 2008 |

21.    Templeton further describes his August 31, 2007, investment of $2,000,000 as follows:

- $664,345 actually paid;

- "crediting $500,000 to Templeton that was due to him on a promissory note by **AHF Development, Ltd.**" (which was uncollectable);

- "crediting $609,748" that was allegedly due to him somehow (*not explained*) by AHF relating to Templeton's limited partnership interest in M2M No. 1, Ltd.; and

- "crediting" $225,907 that was allegedly due to him somehow (*not explained*) by AHF relating to Templeton's limited partnership interest in LIHTC-M2M No. 3, LP. *See* section IV. F. of this Complaint, *infra*.[7]

AHF Alleged Guaranty Liability

22.    The Templeton Claim then correctly states that Article VI of the Walden II Partnership Agreement provides:

- The Limited Partners shall be entitled to a return of their "Initial Capital Contribution" within twelve (12) months, plus

- Eighteen percent (18%) per annum preferential return on the "Initial Capital Contribution."

23.    "Initial Capital Contribution" is defined in section 1.6(e) of the Walden II Partnership Agreement as "the amount of cash, and the fair market value of property or services,

---

[7] It is unclear how Templeton can claim he is owed $200,000 from LIHTC-M2M No. 3, LP in the Templeton Claim when he claims that his interest in LIHTC-M2M No. 3, LP was forfeited in exchange for his interest in Walden II. On May 1, 2007, Templeton assigned his interest in LIHTC-M2M No. 3, LP to AHF-RCL II, LLC, pursuant to the First Amendment to the LIHTC-M2M No. 3, LP Partnership Agreement executed by Templeton on such date. As a result, it is not evident as to why Templeton received a $225,907 credit in Walden II attributable to this interest.

contributed to the Partnership by a Partner, ***prior to the Effective Date***." Walden II Partnership Agreement, § 1.6(e) (emphasis added).

24.     The "Effective Date " is defined in section 1.6(d) of the Partnership Agreement as "the date the Certificate of Limited Partnership . . . is filed with the Secretary of State of Texas." Walden II Partnership Agreement, § 1.6(d).

25.     The Certificate of Limited Partnership was filed with the Secretary of State of Texas on ***August 20, 2007***.  Accordingly, to be an "Initial Capital Contribution" and entitled to return within 12 months plus an 18% preferred return, the contribution must have been contributed ***prior to*** August 20, 2007.

26.     Templeton admits in the Templeton Claim that ***he made no contributions to Walden II prior to August 20, 2007***.

27.     The Templeton Claim asserts that AHF "executed unconditional guarantees ***of the payment obligation contained in the Partnership Agreement***" Templeton Claim, ¶ 38 (emphasis added).   In fact, the Guaranty Agreements attached as T-1, T-2 and T-3 to the Templeton Claim (collectively, the "**Walden II Guarantees**") each provide that "Guarantor guarantees the performance of [Walden II] ***obligations under Article VI of the Agreement***." *See* Guarantees, ¶ 1 (emphasis added).   Since there were no "Initial Capital Contributions" made prior to August 20, 2007, there are no Walden II obligations to Templeton under Article VI of the Walden II Partnership Agreement; therefore, Templeton has no valid claims against AHF under the Walden II Guarantees.

Tax Treatment

28.     The Walden II 2007 federal income tax return reports an ordinary loss of $5,750,000 from "other partnerships", and then lists the other partnerships as only AHF

Development, Ltd. ("AHF Development"). The AHF Development 2007 tax return shows no

such loss and does not even list Walden II as a partner of AHF Development. Walden II

provided Templeton with a 2007 K-1 allocating $1,999,964 of that loss to Templeton (almost

exact same amount as his alleged 2007 contributions, even though Templeton only contributed

$664,345 in cash, with the remaining $1,335,655 in contributions through "credits" for assets

having little or no value).

29.    The Walden II 2008 federal income tax return reports an ordinary loss of

$3,950,000 from "other partnerships", and then again lists the other partnerships as only AHF

Development. The AHF Development 2008 tax return shows no such loss and again does not

list Walden II as a partner. Walden II provided Templeton with a 2008 K-1 allocating

$1,500,000 of that loss to Templeton (same amount as his 2008 contributions of $1,500,000).

30.    The Trustee has not seen the Templeton tax return, but questions:

- Did Templeton write off the AHF-Development Note before or after his
alleged contribution to Walden II in 2007? If so, he could not use that note
contribution as tax basis to support a loss deduction in 2007;

- Where did the Walden II 2007 and 2008 ordinary losses come from? AHF
Development had no such losses reported on its tax returns and does not list
Walden II as a partner in AHF Development—indicating these alleged
ordinary tax loss deductions were falsely manufactured and illegitimate;

- If the ordinary loss deductions of Walden II were illegitimate, the presumed
ordinary loss deductions in 2007 and 2008 would also be illegitimate ordinary
loss deductions.

31.    If Templeton took tax deductions of approximately $3,500,000 in 2007 and 2008,

but only made actual cash contributions of $2,164,345 (ascribing no value to the notes and

claims forfeited), he would have taken deductions of 1.6 to 1. Assuming Templeton was in the

35% tax bracket in 2007 and 2008, his $3,500,000 of illegitimate tax deductions would have

generated tax savings equal to $1,225,000.

C.    **WI-HURIKE, LTD.**

Templeton Contribution

32.    In the Templeton Claim, Templeton alleges that:

- He loaned $200,000.00 to WI-HURIKE, Ltd. ("**Hurike**") on December 16, 2008, evidenced by a promissory note. A copy of that promissory note is attached as Exhibit M to the Templeton Claim.

- On December 16, 2008, AHF executed an unconditional guaranty (the "**Hurike Guaranty**") of "payment and performance" of the promissory note. A copy of that guaranty is attached as Exhibit N to the Templeton Claim.

- He is owed $208,909.74 under the promissory note for principal and interest, plus $5,512.88.

33.    The documents do not support these allegations. Templeton did not "loan" $200,000 under the note. Instead, Templeton purchased a 5% equity interest in Hurike for $200,000. *See* Exhibit M to the Templeton claim, which is a $200,000 check from Martha Templeton, Templeton's wife, stating the check was for "5% WI-HURIKE, Ltd." Exhibit N to the Templeton Claim says that AHF guarantees the "[t]he debt evidenced by the Note dated December 16, 2008, in the principal amount of $200,000.00." There was no loan to guarantee. The Hurike Guaranty does not cover equity investments in Hurike.

34.    There are more documents that show why Templeton did not make a loan, but rather purchased an equity interest. For example, on or around December 16, 2008, Templeton signed a "Subscription Agreement" under which he "accepts the assignment from WI-Hurike, Ltd. . . . and subscribes to 5.0% limited partner interest in [WI-Hurike, Ltd.]." In addition, Templeton was issued a "Schedule K-1 (Form 1065)"[8] for *tax year 2008*. In that K-1,

---

[8] A Schedule K-1 (Form 1065) is submitted to the Internal Revenue Service to show how much an owner/partner of a business (taxed as a partnership) reports as his/her share of the business's income, gain, loss, deduction, credit, etc. A business taxed as a partnership does not pay income tax but "passes through" any profits or losses to its

Templeton is shown to be a limited partner of Hurike. Creditors are not issued Schedule K-1s. Only owners/partners are issued such documents. Additionally, in that K-1, which was prepared in 2009, Templeton was allocated a tax loss of *$2,513,028* for his equity investment in Hurike.

Tax Treatment

35.    As further evidence of Templeton's equity investment in Hurike, he executed a Non-Recourse Promissory Note to evidence his alleged obligations to make additional capital contributions to Hurike. That Non-Recourse Promissory Note is dated ***December 31, 2008***. Under that Non-Recourse Promissory Note, Templeton agreed to pay *$2,513,028* to AHF solely from distributions he received from Hurike related to his *equity* interest therein.

36.    The tax loss allocated to Templeton on his 2008 K-1, which was prepared in 2009, is *$2,513,028.* The amount to be paid by Templeton under the December 31, 2008 Non-Recourse Promissory Note is also *$2,513,028*. Given the exact match in amounts for a tax loss allegedly incurred in 2008, but not known until 2009, and in a promissory note dated December 31, 2008, only one logical conclusion can be drawn: When the 2008 K-1 was prepared in April, 2009, Templeton and others believed that Templeton had insufficient tax basis in Hurike to legally use his share of Hurike's 2008 tax loss. In an attempt to artificially increase Templeton's tax basis, they must have "back-dated" the promissory note to the last day of the 2008 tax year. They apparently did so to attempt to manufacture sufficient tax basis for Templeton so that he could claim a 2008 tax loss of $2,513,028 on his 2008 tax return, which would then be available to shelter other income for a tax savings of $879,559.[9] Accordingly, Templeton took a tax loss

---

owners/partners. Owners/partners must include partnership items – income, gains, losses, deductions – on their tax returns. A Schedule K-1 (Form 1065) is not submitted for creditors, because creditors do not receive tax losses and deductions – and their favorable tax treatment – like owners/partners.

[9] This number assumes that Templeton is in the 35% tax bracket.

TRUSTEE'S FIRST AMENDED COMPLAINT AGAINST ROBERT L. TEMPLETON TO AVOID GUARANTEES AS FRAUDULENT OBLIGATIONS, TO SUBORDINATE ALLOWED CLAIMS, AND TO AVOID AND RECOVER FRAUDULENT AND PREFERENTIAL TRANSFERS, TOGETHER WITH OBJECTIONS TO CLAIMS                    PAGE 17

of over 12.5 times the amount of his $200,000 investment.[10]   The only way these two numbers

can be exactly the same is if the promissory note was created at the same time that the K-1 was

created.

**D.   AHF GRAY RANCH, LTD.**

37.   In the Templeton Claim, Templeton alleges that:

- He invested $250,000 in AHF Gray Ranch, Ltd. ("**Gray Ranch**") on or about May 27, 2008;

- He executed a Limited Partnership Agreement (attached as Exhibit P to the Templeton Claim); and

- On May 23, 2008, AHF executed an unconditional guaranty (the "**Gray Ranch Guaranty**") "of the payment obligation contained in the Partnership Agreement" ( copy of the guaranty is attached as Exhibit Q to the Templeton Claim).

38.   The Trustee objects to the guaranty claim based on the purported May 23, 2008,

Gray Ranch Guaranty attached as Exhibit Q to the Templeton Claim for the following reasons:

- The guaranty provides that "Guarantor agrees to pay, when due or declared due as provided in the *Loan Documents*, the Guaranteed Investment to investor . . . ."  *See* Exhibit Q to the Templeton Claim (emphasis added);

- There are no "Loan Documents."  There is only an equity investment in Gray Ranch; and

- The Gray Ranch Partnership Agreement contains *no* provision requiring the Gray Ranch partnership to return the $250,000 at any time.  Likewise, it contains no accrued-interest, preferred-return, or attorney's fee provisions.

39.   Templeton's assertion that AHF guaranteed repayment of his investment in Gray

Ranch is wrong.  Exhibit Q to the Templeton Claim in no way, shape, or form constitutes an

AHF guarantee of any obligation.  Templeton and the documents confuse the alleged tax-

---

[10] Upon realizing these bogus transactions would be exposed, Templeton apparently amended his federal tax return in some fashion.

advantaged equity investment with the less tax-attractive loan structure.   The Gray Ranch

Guaranty references non-existent "Loan Documents."

## E.   LIHTC-M2M No. 2, LP

40.     In the Templeton Claim, Templeton alleges that:

- He invested $450,000 in LIHTC-M2M No. 2, LP ("**M2M2**") on or about February 24, 2006;

- He executed a Limited Partnership Agreement (attached as Exhibit E to the Templeton Claim);

- He executed an Agreement Regarding Investments (attached as Exhibit F to the Templeton claim) providing that M2M2 guaranteed a return of a *portion* of his investment in M2M2; and

- On April 24, 2006, Sterquell (and presumably by extension AHF) executed an agreement guaranteeing the return of Templeton's investment in M2M2 (the "**M2M2 Guaranty**") (a copy of this purported guaranty is attached as Exhibit G to the Templeton Claim).

41.     The Trustee objects to the guaranty claim based on the purported M2M2 Guaranty

attached as Exhibit G to the Templeton Claim for the following reasons:

- Exhibit G to the Templeton Claim is not a guaranty  It states nowhere on its face that Templeton is guaranteed the return of his $450,000 equity investment in M2M2 by Sterquell, AHF, or anyone else for that matter;

- Moreover, the purported M2M2 Guaranty is not executed by AHF, but rather by Sterquell in his individual capacity;

- The M2M2 Partnership Agreement contains *no* provision requiring the M2M2 partnership to return the $450,000 at any time.   Likewise, it contains no accrued-interest, preferred-return, or attorney's-fee provisions;

- The Agreement Regarding Investments does guaranty that M2M2 – *not AHF* – will return a portion of Templeton's investment, but not the entire $450,000 as Templeton claims and without interest and attorneys fees; and

- Templeton fails to mention to the Court that he transferred his interest in M2M2 to AHF on December 31, 2008 (and took a gift-tax deduction for such transfer); accordingly, Templeton no longer owns a limited partnership interest in M2M2 or any claim related thereto.

42.     Templeton's assertion that AHF somehow guaranteed repayment of his investment in M2M2 is wrong.  The purported M2M2 Guaranty in no way, shape, or form constitutes an AHF guarantee of any obligation.  Templeton and the documents confuse the alleged tax-advantaged equity investment with the less tax-attractive loan structure.  Moreover, the Templeton Claim falsely references "plus accrued interest of $161,408.74" when there is no interest accrued on limited partnership interests.

Tax Treatment

43.     It appears Templeton was provided a 2007 K-1 from M2M2 providing him with illegitimate ordinary losses of $2,244,328.[11]  Templeton only contributed $450,000 to M2M2.  Thus, if Templeton took this deduction, he took at loss deduction of 5 times his investment.  It therefore appears this transaction was structured as an abusive tax shelter similar to the others.

## F.     LIHTC – M2M No. 3, LP

44.     In the Templeton Claim, Templeton alleges that:

- He invested $200,000 in LIHTC – M2M No. 3, LP ("**M2M3**") on or about May 25, 2008;

- He executed a Limited Partnership Agreement (attached as Exhibit B to the Templeton Claim); and

- On May 23, 2008, AHF "executed an unconditional guarantee of the payment obligation contained in the Partnership Agreement" (the "**M2M3 Guaranty**").  A copy of the M2M3 Guaranty is attached as Exhibit C to the Templeton Claim.

---

[11] These losses result from M2M2's 18.99% limited partnership interest in LIHTC Community Development No. 2, Ltd., which falsely reflected approximately $32 million of illegitimate losses on its 2007 federal tax return.

45.    The Trustee objects to the guaranty claim based on the purported M2M3 Guaranty attached as <u>Exhibit C</u> to the Templeton Claim for the following reasons:

- The M2M3 Guaranty provides that "Guarantor agrees to pay, when due or declared due as provided in the ***Loan Documents***, the Guaranteed Investment to investor . . . ." *See* <u>Exhibit C</u> to the Templeton Claim (emphasis added);

- There are no "Loan Documents." There is only an equity investment in M2M3; and

- The M2M3 Partnership Agreement contains ***no*** provision requiring the M2M3 partnership to return the $200,000 at any time. Likewise, it contains no accrued-interest, preferred-return, or attorney's fee provisions.

46.    Templeton's assertion in the Templeton Claim that AHF guaranteed repayment of his investment in M2M3 pursuant to the M2M3 Guaranty is wrong. The M2M3 Guaranty in no way, shape, or form constitutes an AHF guarantee of any obligation. Templeton and the documents confuse the alleged tax-advantaged equity investment with the less tax-attractive loan structure. The M2M3 Guaranty references non-existent "Loan Documents."

<u>Tax Treatment</u>

47.    M2M3 was formed on 8/2/06. The M2M3 tax returns reflect that Templeton and Miller invested $200,000 each in M2M3 in 2006, and that M2M3 used the funds to purchase what is referred to as the "GCL Properties" on 8/2/06. M2M3 then allegedly sold those properties for $448,921 on 9/1/07 (1 yr 1 month), and redeemed Templeton and Miller's 2006 equity investment with the sale proceeds...thereby leaving M2M3 with no assets at the end of 2007.

48.    Apparently Templeton and Miller reacquired equity interests in M2M3 on May 23, 2008 for another $200,000 each. Each then received $200,000 of ordinary loss deductions in 2008 allocated from a loss from something referred to as "AHF-GCL Development".

49.    AHF cannot identify what the GCL Properties referred to in the 2007 returns are (other AHF entities own the "AIMCO-GCL Properties"), nor what "AHF-GCL Development" is. This leads the Trustee to believe that these tax deductions are also falsely manufactured and illegitimate.

## VI.
### CAUSES OF ACTION

**FIRST CAUSE OF ACTION – AVOIDANCE OF FRAUDULENT OBLIGATIONS**

50.    The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

51.    In the unlikely event that any or all of the GOZ No. 1 Guarantees, Walden II Guarantees, Hurike Guaranty, Gray Ranch Guaranty, M2M2 Guaranty and M2M3 Guaranty are determined to be valid contractual obligations owed by AHF to Templeton, such obligations should be avoided as fraudulent (the "**Fraudulent Obligations**") under section 548 of the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act.

52.    Pursuant to section 544(b) of the Bankruptcy Code, the Trustee has the rights of an existing unsecured creditor of AHF.  Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that such creditor could assert under applicable state law.

53.    At all times relevant herein the Trustee in his capacity as such was and is a creditor of AHF.

54.    In furtherance of the scheme to manufacture illegitimate tax losses and deductions, on or within four (4) years (in some instances) or two (2) years (in other instances) of the Petition Date, AHF incurred each Fraudulent Obligation.

55.     The Fraudulent Obligations were incurred with the actual intent to hinder, delay, or defraud then and future creditors of AHF.

56.     AHF received less than reasonably equivalent value in exchange for each of the Fraudulent Obligations.

57.     AHF was insolvent at the time it incurred each of the Fraudulent Obligations.

58.     At the time each Fraudulent Obligation was incurred, AHF was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

59.     At the time each of the Fraudulent Obligations was incurred, AHF intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

60.     The Fraudulent Obligations are, therefore, avoidable as such under sections 548(a)(1)(A) and (a)(1)(B) of the Bankruptcy Code and TEX. BUS. & COMM. CODE § 24.005.


**SECOND CAUSE OF ACTION – MANDATORY SUBORDINATION OF THE TEMPLETON CLAIM**

61.     The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

62.     Pursuant to the provisions of section 510(b) of the Bankruptcy Code, the Templeton Claim should be subordinated to the allowed claims of legitimate general unsecured creditors for purposes of distribution as the Templeton Claim arises from the purchase or sale of a security of an affiliate of AHF.

### THIRD CAUSE OF ACTION – EQUITABLE SUBORDINATION OF THE TEMPLETON CLAIM

63.     Templeton engaged in inequitable conduct, including conduct described in this Complaint, that has resulted in injury to creditors or the conferring of an unfair advantage on or to him.  This inequitable conduct has resulted in harm to the AHF bankruptcy estate and its entire creditor body.  Accordingly, pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code, all claims asserted by, on behalf of, or for the benefit of Templeton or his affiliates or related entities against AHF should be equitably subordinated to the allowed claims of legitimate general unsecured creditors for distribution purposes because Templeton's claims arise from improper conduct in the form of illegitimate and improper tax activities.

64.     The Trustee cannot at this time identify every claim that have been filed that may, indirectly, be for the benefit of or on behalf of Templeton or his affiliates or related entities because information necessary to make this determination is exclusively in the possession of others.  The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, that are asserted or sought by Templeton or his affiliated or related entities, directly or indirectly, are subordinated pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.  No funds that would otherwise be paid to general unsecured creditors should be paid to Templeton, his affiliates, or his related entities.

### FOURTH CAUSE OF ACTION – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS

65.     The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

66.     AHF and/or AHF Development, Ltd. ("**AHF Development**") paid or caused to be paid, and Templeton received, the sum of approximately $1,167,972.52, which includes, without limitation, the transfers listed on the attached Exhibit A (collectively, the "**Transfers**").

67.     At all times relevant herein, the Trustee in his capacity as such was and is a creditor of AHF and/or AHF Development.

68.     Each Transfer was made at various times within four years of the Petition Date.

69.     Each Transfer was made with the actual intent to hinder, delay, or defraud then and future creditors of AHF and/or AHF Development.

70.     In exchange for each Transfer, AHF and/or AHF Development did not receive reasonably equivalent value.

71.     When each Transfer was made, AHF and/or AHF Development were engaged or about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

72.     AHF and/or AHF Development were insolvent when each Transfer was made.

73.     Each Transfer was received by Templeton with knowledge that AHF and/or AHF Development intended to hinder, delay, or defraud their then and future creditors.

74.     The Transfers are, therefore, avoidable under section 548(a)(1)(A) and (a)(1)(B) of the Bankruptcy Code and TEX. BUS. & COMM. CODE § 24.005

75.     To the extent the Transfers are avoided under sections 544 or 548 of the Bankruptcy Code, under section 550 of the Bankruptcy Code, the Trustee may recover the value of the Transfers from the transferees of the Transfers for the benefit of AHF's and/or AHF Development's bankruptcy estate(s).

**FIFTH CAUSE OF ACTION – AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS**

76.     The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

77.     Each Transfer was made to or for the benefit of a creditor of AHF and/or AHF Development.

78.     Each Transfer was made for or on account of an antecedent debt owed by AHF and/or AHF Development before each such Transfer was made.

79.     Each Transfer was made while AHF and/or AHF Development were insolvent.

80.     Each Transfer was made on or within one year of the Petition Date.[12]

81.     As a result of the Transfers, Templeton received more than he would receive (a) under AHF's and/or AHF Development's chapter 7 bankruptcy proceeding(s), (b) if the Transfers had not been made, and (c) under the provisions of the Bankruptcy Code.

82.     To the extent the Transfers are avoided under section 547 of the Bankruptcy Code, under section 550 of the Bankruptcy Code, the Trustee may recover the value of the Transfers from the transferees of the Transfers for the benefit of AHF's and/or AHF Development bankruptcy estate(s).

### SIXTH CAUSE OF ACTION – DISALLOWANCE OF TEMPLETON CLAIM UNDER 11 U.S.C. § 502(D)

83.     The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

84.     By reason of the facts alleged in this Complaint, pursuant to section 502(d) of the Bankruptcy Code, all claims asserted by Templeton, his affiliates, or his related entities must be disallowed unless he has turned over to the Trustee the property transferred, or paid to the Trustee the value of such property for which he is liable to the Trustee, under section 550 of the Bankruptcy Code.

---

[12] Templeton was an "insider" of AHF and/or AHF Development; therefore, the Trustee is allowed to recover preferential transfers dating back to one year prior to the Petition Date. *See* 11 U.S.C. § 547(b)(4)(B).

85.     To the extent the Transfers are avoided under sections 544, 547, or 548 of the

Bankruptcy Code, under section 550 of the Bankruptcy Code, the Trustee may recover the value

of the Transfers from the transferees of the Transfers for the benefit of AHF's bankruptcy estate.

## VII.
### REQUEST FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in his

favor and against Templeton as follows:

(i)      ordering that the Templeton Claim is disallowed in its entirety for all purposes;

(ii)     in the alternative, ordering that the Fraudulent Obligations are avoided and set
aside;

(iii)    further in the alternative, ordering that any allowed portion of the Templeton
Claim is subordinated to the allowed claims of general unsecured creditors for
distribution purposes;

(iii)    avoiding and setting aside the Transfers;

(iv)     ordering that Templeton must return the Transfers to the Debtor's estate or pay
the Debtor's estate the value thereof;

(v)      ordering that the Templeton Claim is disallowed until the Transfers or the value
thereof, for which Templeton is liable under section 550 of the Bankruptcy Code,
have been returned to the Debtor's estate;

(vi)     conditioning the award of any equitable relief upon a showing that claimant has
"clean hands" and has not been involved in any inequitable conduct;

(vii)    awarding the Trustee his attorneys' fees and costs of suit; and

(viii)   awarding the Trustee all such other and further relief, at law or in equity, to which
he may be justly entitled.

Dated:  April 4, 2011                    Respectfully submitted,

                                         /s/ Max Tarbox
                                         Max R. Tarbox (TX 19639950)
                                         Tarbox Law, P.C.
                                         2301 Broadway
                                         Lubbock, Texas 79401
                                         Phone: (806) 686-4448
                                         Fax:    (806) 368-9785

                                         And

                                         /s/ Marcus A. Helt
                                         Stephen A. McCartin (TX 13374700)
                                         Marcus A. Helt (TX 24052187)
                                         GARDERE WYNNE SEWELL LLP
                                         1601 Elm Street, Suite 3000
                                         Dallas, Texas  75201-4761
                                         Telephone:  214.999.3000
                                         Facsimile:  214.999.4667

                                         **COUNSEL FOR WALTER
                                         O'CHESKEY, TRUSTEE**

# EXHIBIT A

| Exhibit A to Complaint Against Robert Templeton | | | |
| --- | --- | --- | --- |
| **Transferor** | **Transferee** | **Date of Transfer** | **Amount of Transfer** |
| AHF | Martha Templeton | 05/01/05 | 5,000.00 |
| AHF | Martha Templeton | 6/7/2005 | 5,000.00 |
| AHF | Martha Templeton | 7/5/2005 | 5,000.00 |
| AHF | Martha Templeton | 8/5/2005 | 5,000.00 |
| AHF | Bob Templeton | 8/19/2005 | 150,000.00 |
| AHF | Martha Templeton | 9/7/2005 | 5,000.00 |
| AHF | Martha Templeton | 10/10/05 | 5,000.00 |
| AHF | Martha Templeton | 11/04/05 | 5,000.00 |
| AHF | Martha Templeton | 12/02/05 | 5,000.00 |
| AHF | Martha Templeton | 2/6/2006 | 5,000.00 |
| AHF | Martha Templeton | 2/14/2006 | 160,000.00 |
| AHF | Martha Templeton | 3/14/2006 | 5,000.00 |
| AHF | Martha Templeton | 3/31/2006 | 5,000.00 |
| AHF | Martha Templeton | 5/1/2006 | 5,000.00 |
| AHF | Martha Templeton | 6/1/2006 | 5,000.00 |
| AHF | Martha Templeton | 7/5/2006 | 5,000.00 |
| AHF | Martha Templeton | 8/2/2006 | 5,000.00 |
| AHF | Martha Templeton | 9/1/2006 | 5,000.00 |
| AHF | Martha Templeton | 10/3/2006 | 5,000.00 |
| AHF | Martha Templeton | 11/8/2006 | 5,000.00 |
| AHF | Martha Templeton | 12/4/2006 | 5,000.00 |
| AHF | Martha Templeton | 1/5/2007 | 5,000.00 |
| AHF | Martha Templeton | 2/2/2007 | 5,000.00 |
| AHF | Martha Templeton | 3/1/2007 | 5,000.00 |
| AHF | Martha Templeton | 4/9/2007 | 5,000.00 |
| AHF | Martha Templeton | 5/3/2007 | 5,000.00 |
| AHF | Martha Templeton | 6/4/2007 | 5,000.00 |
| AHF | Martha Templeton | 7/5/2007 | 5,000.00 |
| AHF | Martha Templeton | 8/10/2007 | 5,000.00 |
| AHF | Martha Templeton | 8/31/2007 | 5,000.00 |
| AHF | Martha Templeton | 10/1/2007 | 27,000.00 |
| AHF | Martha Templeton | 10/2/2007 | 3,000.00 |
| AHF | Bob Templeton | 1/3/2008 | 200,000.00 |
| AHF | Robert Templeton | 1/3/2008 | 90,000.00 |
| AHF | Robert Templeton | 4/1/2008 | 88,767.12 |
| AHF | Robert Templeton | 4/1/2008 | 16,027.40 |
| AHF | Robert Templeton | 7/8/2008 | 90,000.00 |
| AHF | Robert Templeton | 7/8/2008 | 22,500.00 |
| AHF | Robert Templeton | 7/8/2008 | 23,178.00 |
| AHF | Robert Templeton | 2/2/2009 | 90,000.00 |
| AHF | Robert Templeton | 2/2/2009 | 22,500.00 |
| AHF | Robert Templeton | 2/2/2009 | 45,000.00 |
| | | | 1,167,972.52 |