Max R. Tarbox (TX 19639950)
max@tarboxlaw.com
TARBOX LAW, P.C.
2301 Broadway
Lubbock, Texas 79401
Phone: 806.686.4448
Fax:  806.368.9785

Stephen A. McCartin (TX 13374700)
smccartin@gardere.com
Marcus A. Helt (TX 24052187)
mhelt@gardere.com
Barry M. Golden (TX 24002149)
bgolden@gardere.com
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas  75201-4761
Telephone:  214.999.3000
Facsimile:  214.999.4667

**COUNSEL FOR WALTER O'CHESKEY,**
**TRUSTEE OF THE AHF LIQUIDATING TRUST**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **American Housing Foundation,** | § | **Case No.:  09-20232-RLJ** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **Walter O'Cheskey, as Chapter 11 Trustee,** | § | **Adversary No. 10-02016-RLJ** |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| **Robert Templeton,** | § | |
| Defendant. | § | |
| | § | |
| | § | **(Consolidated with)** |
| **Walter O'Cheskey, as Chapter 11 Trustee,** | § | |
| Plaintiff, | § | **Adversary No. 10-02017-RLJ** |
| v. | § | |
| **David Miller,** | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

**TRUSTEE'S SECOND AMENDED COMPLAINT AGAINST DAVID MILLER**
**TO AVOID GUARANTEES AS FRAUDULENT OBLIGATIONS, TO SUBORDINATE**
**ALLOWED CLAIMS, AND TO AVOID AND RECOVER FRAUDULENT**
**TRANSFERS, TOGETHER WITH OBJECTIONS TO CLAIMS**

# TABLE OF CONTENTS

I.    Executive Summary ...................................................................................................1

II.   Soft-Money-Investor Claims Generally .....................................................................2

    A.    WI-HURIKE, LTD. ...........................................................................................4

    B.    LIHTC-M2M No. 2, LP ....................................................................................5

    C.    STUDENT CARE FOUNDATION ...................................................................5

    D.    GOZ NO. 1, LTD. .............................................................................................5

III.  Objections to "Soft-Money-Investor" Claims Generally ............................................7

IV.   Jurisdiction and Venue ...............................................................................................7

V.    Objection to Miller Claims .........................................................................................8

    A.    GOZ NO. 1, LTD. .............................................................................................8

    B.    LIHTC-M2M NO. 2, LP .................................................................................10

    C.    LIHTC–M2M No. 3, LP .................................................................................11

    D.    WI-HURIKE, LTD. .........................................................................................13

VI.   Causes of Action ......................................................................................................15

    First Cause of Action – Avoidance of Fraudulent Obligations............................15

    Second Cause of Action – Mandatory Subordination of the Miller Claim.......................16

    Third Cause of Action – Equitable Subordination of the Miller Claim............................16

    Fourth Cause of Action – Avoidance And Recovery Of Fraudulent Transfers.................17

    Fifth Cause of Action – Disallowance Of Miller Claim Under 11 U.S.C. § 502(d)..........18

VII.  Request for Relief .....................................................................................................19

Walter O'Cheskey, the trustee of the AHF Liquidating Trust (the "**Trustee**" or "**Plaintiff**") for American Housing Foundation ("**AHF**" or "**Debtor**"), hereby files this *Complaint* (the "**Complaint**") against Defendant David Miller ("**Miller**" or "**Defendant**"). In support of this Complaint, the Trustee respectfully states as follows:

## I.
## EXECUTIVE SUMMARY

Summary of Claims and Objections

1.      The Miller proof of claim asserts claims against AHF related to his equity investments in the following entities:

| Entity | Amount Invested | Summary of Objections |
|---|---|---|
| 1) GOZ No. 1, Ltd. | $ 250,000 | • No valid guaranteed investment |
| | | • Abusive Tax Shelter -- $1,174,370 of illegitimate losses per K-1 ($924,371 fraudulent Non-Recourse Note utilized) |
| 2) LIHTC M2M No. 2, Ltd. | $ 450,000 | • No valid guaranteed obligation |
| | | • Abusive Tax Shelter-- $2,244,328 of illegitimate losses per K-1 |
| 3) LIHTC M2M No. 3 Ltd. | $ 200,000 | • No valid guaranteed obligation |
| | | • Abusive Tax Shelter-- $200,000 of illegitimate losses on 2008 K-1 |
| Total invested | $ 900,000 | |
| Interest alleged | 251,080 | |
| Attorney Fees & Cost | 24,774 | |
| Total Claims | $1,175,854 | |

## II.
### SOFT-MONEY-INVESTOR CLAIMS GENERALLY

2.      There are substantial legitimate unsecured claims against AHF.  AHF directly or

indirectly owns interests in special purpose entities that own and operate approximately 66

apartment complexes located in nine states ("**SPEs**").  These SPEs were formed for a legitimate

business purpose: to provide affordable housing while at the same time providing limited

partner/tax-credit partners and AHF with legitimate real-estate-investment opportunities.

3.      While AHF and the tax-credit limited partners were engaged in the legitimate

affordable-housing business through the SPEs, Sterquell and certain "soft-money" partners were

involved in illegitimate tax deductions in return for what were in actuality loans.  The following

is an example of how the typical "soft-money" investment worked:

> Sterquell would tell his "partners" that if they would "invest" funds
> in a non-Debtor entity, he would promise to repay the investment
> within one year, together with 18% per-annum interest, ***plus***
> provide them with tax deductions at least equal to and sometimes
> several times their actual investment (in many instances 4 to 12
> times the amount invested).  In order to obtain tax deductions of
> several times the investment, Sterquell and the soft-money
> investors manufactured "basis" and/or eliminated negative capital
> accounts by executing sham non-recourse notes.

4.      Sterquell attempted to structure this illegitimate tax scheme as follows:

a.    Sterquell would form a limited partnership.  An AHF wholly-
owned shell entity would usually serve as the general partner.

b.    The investor would then advance funds to the partnership in
exchange for a number of things:

   (i)    a limited partnership interest;

   (ii)   in some, but not all instances, a partnership promise to
   return the "capital contribution" within one year together
   with a "preferred return" of up to 18% per annum;

   (iii)  if the partnership had insufficient funds to return the
   capital and preferred return, the shell general partner

promised to make a contribution to the partnership (which it could never make because it owned no assets and operated no business) so that the partnership could make the promised return; and

(iv) in many instances, Sterquell and AHF guaranteed that the partnership would return the funds with interest as promised.

c. To obtain tax deductions several times larger than their actual investment, the investor, in many instances, would execute large **non-recourse** notes to allegedly evidence the obligation of the investor to make additional capital contributions to the partnership. These non-recourse notes were a fiction since they were payable solely from the partnership's distributions to the investor (which were never expected). Accordingly, neither the partnerships nor the investors ever intended or expected for the notes to be repaid. The notes were executed for the purpose of manufacturing the investor's "tax basis" so that the investor could take large tax deductions on his federal income tax returns and/or to eliminate negative capital accounts to avoid tax on phantom income. In many instances, the non-recourse notes were falsely back dated to take advantage of previous year losses.

5.     The soft-money structure was designed by Sterquell and participated in by the "soft-money" investors who knew, or should have known, that the investment was purely for illegitimate and improper tax purposes.

**Example:  Miller's Investment in GOZ No. 1, Ltd.**

6.     One example speaks volumes.  Miller is a large "soft-money" investor who has filed a claim against AHF for over $1.175 million.  Miller's "investment" in GOZ No. 1, Ltd. ("**GOZ**") is illustrative of the illegitimate scheme:

- Miller advanced $250,000 to GOZ in exchange for a     42.5% limited partnership interest in GOZ;

- The GOZ partnership agreement did not provide a promise to return the "capital" within one year (as many partnership agreements did);

- Sterquell and AHF signed a guarantee in which they guaranteed "to pay, when due or declared due as provided in the **Loan Documents**" Miller's investment (but there are no "Loan Documents," merely a partnership agreement);

- Miller then attempted to falsely manufacture additional "tax basis" in the partnership to allow him to take tax deductions of $1,174,371 (4.7 times his actual investment) by executing a "Non-Recourse Promissory Note" in the amount of $924,371 ($924,371 + $250,000 original investment = $1,174,371 deduction). This note is payable solely from distributions, if any, from GOZ (which, of course, there were never expected to be any). This note was never intended to be paid but rather improperly used to manufacture tax basis so that Miller could claim illegitimate tax deductions on his federal tax returns.

7.      As stated, this structure led Miller to take tax deductions of $1,174,371 from his $250,000 investment in GOZ, which is 4.7 times his investment. If Miller's tax rate were 35% in the appropriate year, these deductions saved Miller $411,029 in taxes. Accordingly, within the first year and from the illegitimate tax deductions alone, Miller recovered his initial $250,000 investment in GOZ plus an additional $160,000.

8.      The following questions and answers in the April 7 and 8, 2010 deposition of Robert Templeton ("**Templeton**") – who made investments in GOZ, LIHTC-M2M No. 2, LP and LIHTC-M2M No. 3, LP identical to those made by Miller – clearly show that the soft-money entities were used, along with non-recourse promissory notes, to improperly build tax basis to allow soft-money investors to take illegitimate tax deductions on their federal income tax returns:

QUESTIONS RELATED TO TEMPLETON'S INVESTMENTS IN:

A.      **WI-HURIKE, LTD.**

When asked to explain the Hurike partnership, Templeton answered:

A: . . . he [Sterquell] conceived this limited partnership of HURIKE – and for the – for the reasons of ability to deduct. Okay? And he initially told me he was

> – that I would receive a million dollar deduction. Okay. And that I wouldn't
> have to put up any money. And that just sounded – I mean, that just sounded
> wonderful . . . .

Templeton Depo. at 92:16-24.

> A: . . . and I said, well, what is – you know, what is the deduction that's available
> on that? And he says, well, if you'll put up $200,000, I'll allow you another
> million dollar deduction. So I put up the 200,000 . . . .

*Id.* at 93:7-10.

> A: . . . and then . . . I got this K-1 . . . . It was for $2,513,028 not an even two
> million.

*Id.* at 94:3-14.

## B.    LIHTC-M2M No. 2, LP

When asked, "What do you know about LIHTC-M2M?", Templeton answered:

> A: I'm not sure I can tell you.[1]

Templeton Depo. at 52:9-10.

## C.    STUDENT CARE FOUNDATION

When asked, "Do you know what that entity [Student Care Foundation] is?",
Templeton answered:

> A: I don't know what the entity was or what purpose he [Sterquell] had in mind
> for it.[2]

Templeton Depo. at 87:4-12.

## D.    GOZ NO. 1, LTD.

When asked to explain the $924,371 non-recourse note he executed,
Templeton answered:

---

[1] Templeton does not know anything about this limited partnership? Yet, he invested $450,000 in this entity and
owned a 42.5% limited partnership interest therein.

[2] Again, Templeton does not know anything about the partnership? Yet, he owned 42.5% of GOZ No. 1, Ltd.,
which owned 66% of Student Care Foundation.

> A: You know, on a couple of these occasions . . . he [Sterquell] prepared a nonrecourse note for *some* tax purpose. And that may have been one of those nonrecourse notes.
>
> Q: So your investment was shown as $924,371 for tax purposes –
>
> A: I don't know.

Templeton Depo. at 78:11-22 (emphasis added).

> Q: And it's your further testimony that you don't actually know the source of the number – in other words, the 924,371 . . . nonrecourse promissory note is not a number that you understand?
>
> A: But where [Sterquell] came up with it and how he arrived at it, Mr. Martinez, I can't tell you.
>
> Q: Do you recall the circumstances under which he told you about this note . . . ?
>
> A: He says that's in connection with the transaction and with taxes . . . .

*Id.* at 79:21 – 80:10.

> Q: [B]ut did you ever pay that note?
>
> A: No.
>
> Q: Did you ever receive demand to pay that note?
>
> A: No.
>
> Q: So that note would be – still an outstanding nonrecourse indebtedness?
>
> A: [A]n outstanding nonrecourse indebtedness is not an indebtedness you have to pay. So I don't think I owe the amount of money …
>
> Q: So this is a promissory note that was strictly created for the IRS?
>
> A: It was created by Steve Sterquell in his plan. And his plan, you and I can't ask him about now. Okay? …

*Id.* at 96:3-22.

## III.
### OBJECTIONS TO "SOFT-MONEY-INVESTOR" CLAIMS GENERALLY

9.      The trustee objects to these "soft-money-investor" claims for one or more of the

following reasons:

   a.   In some instances, the partnership agreement does not require
        the partnership to return the capital within one year as alleged;

   b.   When a partnership agreement does require a return of the
        capital contribution plus a preferred return within one year, in
        many instances there are (i) no written AHF guarantees of the
        partnership's obligation, or (ii) if there is an AHF guaranty, the
        guaranty constitutes an avoidable fraudulent obligation under
        the applicable state and federal fraudulent transfer statutes
        because AHF did not receive fair equivalent value in exchange
        for the guaranty obligation that it incurred while insolvent;

   c.   If there is an AHF guaranty, the guaranty was obtained in an
        illegitimate tax scheme and for no valid business purpose and
        therefore is unenforceable;

   d.   The guaranty claim is a claim arising from the sale or exchange
        of a security of an affiliate of AHF and is subordinated to other
        legitimate general unsecured claims pursuant to section 510(b)
        of the Bankruptcy Code; and

   e.   The soft-money investors either knew or should have known
        that they were participating in significant improper conduct,
        including the improper tax scheme; accordingly, the claims of
        the soft-money investors are subject to equitable subordination
        pursuant to section 510(c) of the Bankruptcy Code and cannot
        be allowed in equity due to "unclean hands" of the claimant.

## IV.
### JURISDICTION AND VENUE

10.     On April 21, 2009 (the "**Petition Date**"), certain alleged creditors of AHF filed an

involuntary petition against AHF pursuant to chapter 11 and section 303 of title 11 of the United

States Code (the "**Bankruptcy Code**") thus initiating the involuntary case [Case No. 09-20232]

(the "**Involuntary Case**").[3]   On June 11, 2009, AHF filed a voluntary petition pursuant to

chapter 11 of the Bankruptcy Code, initiating the voluntary case [Case No. 09-20373] (the

"**Voluntary Case**").   On July 17, 2009, the Court entered its *Agreed Order Granting Motion to*

*Consolidate Bankruptcy Cases* [Docket No. 88], consolidating the Voluntary Case and the

Involuntary Case into a single case pursuant to Bankruptcy Rule 1015(a).

11.    This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§

157(a) and (b) and 1334.  This is a core proceeding as defined in 28 U.S.C. § 157(b).  If any part

of this adversary proceeding is found to be "non-core" under Bankruptcy Rule 7008, the Trustee

consents to the entry of final orders and judgments by this Court.  Venue is proper in this Court

under 28 U.S.C. §§ 1408 and 1409.

12.    This Complaint is brought in accordance with Federal Rules of Bankruptcy

Procedure 7001, *et seq.*, and seeks relief under sections 105, 502(d), 510(b), 510(c), 544, 547(b),

548, and 550 of the Bankruptcy Code and section 24.005 of the Texas Business and Commerce

Code.

**V.**
**OBJECTION TO MILLER CLAIMS**

A.    **GOZ NO. 1, LTD.**

13.    Miller alleges in his proof of claim #85-1 filed on October 6, 2009 (the "**Miller**

**Claim**") that:

- He invested $250,000 in GOZ on or about March 1, 2006 in
  exchange for a 42.5% limited partnership interest therein;

- He executed a Limited Partnership Agreement (attached as
  Exhibit I to the Miller Claim); and

---

[3] All references to the "Bankruptcy Code" are made to 11 U.S.C. §§ 101 *et seq.*  Unless otherwise indicated, all
section references are references to the Bankruptcy Code.

- On March 1, 2006, AHF "executed an unconditional guarantee of the payment obligation contained in the Partnership Agreement" (a copy of the guaranty is attached as <u>Exhibit J</u> to the Miller Claim).

14.    The Trustee objects to the guaranty claim based on the purported March 1, 2006, Guaranty Agreement attached as <u>Exhibit J</u> to the Miller Claim for the following reasons:

- The guaranty provides that "Guarantor agrees to pay, when due or declared due as provided in the *Loan Documents*, the Guaranteed Investment to investor . . . ." *See* <u>Exhibit J</u> to the Miller Claim (emphasis added);

- There are no "Loan Documents." There is only an equity investment in GOZ; and

- The GOZ Partnership Agreement contains *no* provision requiring the GOZ partnership to return the $250,000 capital contribution at any time. Likewise, it contains no accrued-interest, preferred-return, or attorney's fee provisions.

15.    Miller then asserts in the Miller Claim that, on April 24, 2006, AHF again guaranteed "repayment of the investment" pursuant to the document attached as <u>Exhibit K</u> to the Miller Claim. The March 1 and April 24, 2006 guarantees are collectively referred to herein as the "**GOZ Guarantees.**" Miller is wrong. <u>Exhibit K</u> in no way, shape, or form constitutes an AHF guarantee of any obligation. The guaranty references non-existent "Loan Documents," and the Miller Claim falsely references "plus accrued interest of $89,671.41" when there is no interest accrued on the limited partnership interests.

<u>Tax Treatment</u>

16.    It appears Miller was provided a 2007 K-1 form GOZ No. 1 providing him with $1,174,370 of ordinary tax losses. Miller only invested $250,000 in GOZ No. 1, so he executed a non-recourse note in April, 2008 (falsely back dated to January 1, 2008) evidencing an alleged promise to make a future capital contribution to GOZ No. 1. This $924,371 non-recourse note

plus his $250,000 capital contribution adds up to almost exactly to the $1,174,370 tax loss.

Miller was apparently attempting to falsely build tax basis and/or to falsely eliminate a negative

capital account to avoid tax on phantom income resulting from these losses.

**B.     LIHTC-M2M NO. 2, LP**

    17.    In the Miller Claim, Miller alleges that:

- He invested $450,000 in LIHTC-M2M No. 2, LP ("**M2M2**")
  on or about February 24, 2006;

- He executed a Limited Partnership Agreement (attached as
  Exhibit E to the Miller Claim);

- He executed an Agreement Regarding Investments (attached as
  Exhibit F to the Miller claim) providing that M2M2 guaranteed
  a return of a *portion* of his investment in M2M2; and

- On April 24, 2006, Sterquell (and presumably by extension
  AHF) executed an agreement guaranteeing the return of
  Miller's investment in M2M2 (the "**M2M2 Guaranty**") (a
  copy of this purported guaranty is attached as Exhibit G to the
  Miller Claim).

    18.    The Trustee objects to the guaranty claim based on the purported M2M2 Guaranty

attached as Exhibit G to the Miller Claim for the following reasons:

- Exhibit G to the Miller Claim is not a guaranty   It states
  nowhere on its face that Miller is guaranteed the return of his
  $450,000 equity investment in M2M2 by Sterquell, AHF or
  anyone else for that matter;

- Moreover, the purported M2M2 Guaranty is not executed by
  AHF, but rather by Sterquell in his individual capacity;

- The M2M2 Partnership Agreement contains *no* provision
  requiring the M2M2 partnership to return the $450,000 at any
  time.   Likewise, it contains no accrued-interest, preferred-
  return, or attorney's-fee provisions; and

- The Agreement Regarding Investments does guaranty that
  M2M2 – *not AHF* – will return a portion of Miller's

investment but not the entire $450,000 as Miller claims and not
with interest and attorneys' fees.

19.     Miller's assertion that AHF somehow guaranteed repayment of his investment in

M2M2 is wrong.  The purported M2M2 Guaranty in no way, shape, or form constitutes an AHF

guarantee of any obligation.  Miller and the documents confuse the alleged tax-advantaged

equity investment with the less tax-attractive loan structure.  Moreover, the Miller Claim falsely

references "plus accrued interest of $161,408.74" when there is no interest accrued on limited

partnership interests.

Tax Treatment

20.     It appears Miller was provided a 2007 K-1 from M2M2 providing him with

illegitimate ordinary losses of $2,244,328.[4]  Miller only contributed $450,000 to M2M2.  Thus, if

Miller took this deduction, he took at loss deduction of 5 times his investment.  It therefore

appears this transaction was structured as an abusive tax shelter similar to the others.

C.     LIHTC–M2M No. 3, LP

21.     In the Miller Claim, Miller alleges that:

- He invested $200,000 in LIHTC – M2M No. 3, LP ("**M2M3**")
  on or about August 6, 2008;

- He executed a Limited Partnership Agreement (attached as
  Exhibit B to the Miller Claim); and

- On May 23, 2008, AHF "executed an unconditional guarantee
  of the payment obligation contained in the Partnership
  Agreement" (the "**M2M3 Guaranty**").  A copy of the M2M3
  Guaranty is attached as Exhibit C to the Miller Claim.

22.     The Trustee objects to the guaranty claim based on the purported M2M3 Guaranty

attached as Exhibit C to the Miller Claim for the following reasons:

---

[4] These losses result from M2M2's 18.99% limited partnership interest in LIHTC Community Development No. 2,
Ltd., which falsely reflected approximately $32 million of illegitimate losses on its 2007 federal tax return.

- The M2M3 Guaranty provides that "Guarantor agrees to pay, when due or declared due as provided in the *Loan Documents*, the Guaranteed Investment to investor . . . ." *See* <u>Exhibit C</u> to the Miller Claim (emphasis added);

- There are no "Loan Documents." There is only an equity investment in M2M3; and

- The M2M3 Partnership Agreement contains *no* provision requiring the M2M3 partnership to return the $200,000 at any time. Likewise, it contains no accrued-interest, preferred-return, or attorney's fee provisions.

23.   Miller's assertion in the Miller Claim that AHF guaranteed repayment of his investment in M2M3 pursuant to the M2M3 Guaranty is wrong. The M2M3 Guaranty in no way, shape, or form constitutes an AHF guarantee of any obligation. Miller and the documents confuse the alleged tax-advantaged equity investment with the less tax-attractive loan structure. The M2M3 Guaranty references non-existent "Loan Documents."

<u>Tax Treatment</u>

24.   The M2M3 tax returns, K-1s and amendments to partnership agreement indicate:

**2007**

- M2M3 was formed 8/2/06;

- Templeton invested $200,000 for a 42.5% limited partnership interest in M2M3;

- Miller invested $200,000 for a 42.5% limited partnership interest in M2M3;

- M2M3 purchased something referred to as the "GCL Properties".

- On 5/1/07 Templeton and Miller sold their 42.5% interests to AHF-RCL II, LLC (owned by AHF) (even though 2007 tax return shows AHF as becoming the owner of a 99% limited partnership interest, not AHF-RCL II, LLC);

- On 6/18/07 Miller received a check for $596,112;

- On 7/18/07 Luxor Oil & Gas (owned 50% by Miller and 50% by Templeton) received a check for $223,014; and

- The 2007 tax return indicates M2M3 sold the "GCL Properties" on 9/1/07, leaving M2M3 with no assets.

**2008**

- Apparently Templeton and Miller each purchased a 42.5% limited partnership interests in M2M3 (which had no assets) on May 23, 2008 from AHF-RCL, LLC for $200,000 each; and

- Templeton and Miller then received 2008 K-1s providing them with ordinary loss deductions of $198,000 from something referred to as "AHF-GCL Development".

25.      AHF cannot identify what the GCL Properties referred to in the 2007 returns are (other AHF entities own the "AIMCO-GCL Properties"), nor what "AHF-GCL Development" is. This leads the Trustee to believe that these tax deductions were also falsely manufactured and illegitimate.

**D.    WI-HURIKE, LTD.**

26.      While Miller intentionally decided not to include his claim related to WI-Hurike, Ltd. ("Hurike") in his proof of claim (Templeton did include this identical investment in his claim), the Trustee believes the inequitable conduct of Miller related to the Hurike abusive tax shelter transaction constitutes inequitable conduct which precludes Miller from the award of any equitable relief herein.

27.      On October 5, 2008, Miller signed a Subscription Agreement to acquire a 7.5% limited partner interest in WI-Hurike. Miller was issued a "Schedule K-1 (Form 1065)"[5] from Hurike for **_tax year 2008_** in which Miller was allocated illegitimate tax losses of **_$2,513,028_** for his equity investment of $200,000 in Hurike.

---

[5] A Schedule K-1 (Form 1065) is submitted to the Internal Revenue Service to show how much an owner/partner of a business (taxed as a partnership) reports as his/her share of the business's income, gain, loss, deduction, credit, etc. A business taxed as a partnership does not pay income tax but "passes through" any profits or losses to its owners/partners. Owners/partners must include partnership items – income, gains, losses, deductions – on their tax returns. A Schedule K-1 (Form 1065) is not submitted for creditors, because creditors do not receive tax losses and deductions – and their favorable tax treatment – like owners/partners.

28.     On or about March 27, 2009 Miller executed a Non-Recourse Promissory Note in the amount of $2,513,028 to evidence his alleged obligation to make additional capital contributions to Hurike.  That Non-Recourse Promissory Note is back-dated to ***December 31, 2008***.  Under that Non-Recourse Promissory Note, Miller agreed to pay the ***$2,513,028*** solely from distributions he received from Hurike related to his ***equity*** interest therein.

29.     The tax loss allocated to Miller on his 2008 K-1, which was prepared in 2009, is ***$2,513,028.***  The amount to be paid by Miller under the December 31, 2008 Non-Recourse Promissory Note is also ***$2,513,028***. Given the <u>exact match</u> in amounts of the tax loss allegedly incurred in 2008, but not known until 2009, and the promissory note dated December 31, 2008, only one logical conclusion can be drawn:  When the 2008 K-1 was prepared in March, 2009, Miller and others apparently believed that Miller had insufficient tax basis in Hurike to legally use his share of Hurike's 2008 tax loss.  In an attempt to artificially increase Templeton's 2008 tax basis, they "back-dated" the promissory note to the last day of the 2008 tax year.  They presumably did so to attempt to manufacture sufficient tax basis for Miller so that he could claim a 2008 tax loss of $2,513,028 on his 2008 tax return, which would then be available to shelter other income for a tax savings of $879,559.[6]  Accordingly, Miller was provided a tax loss of over 12.5 times the amount of his $200,000 investment.[7]  The only way these two numbers can be exactly the same is if the promissory note was created at the same time that the K-1 was created.

---

[6] This number assumes that Miller is in the 35% tax bracket.

[7] We have not been provided a copy of the Miller tax return to see if he took this loss deduction at this time.  Upon realizing these bogus transactions would be exposed, Templeton apparently amended his federal tax return in some fashion.

TRUSTEE'S SECOND AMENDED COMPLAINT AGAINST DAVID MILLER TO AVOID GUARANTEES AS
FRAUDULENT OBLIGATIONS, TO SUBORDINATE ALLOWED CLAIMS, AND TO AVOID
AND RECOVER FRAUDULENT TRANSFERS, TOGETHER WITH OBJECTIONS TO CLAIMS                    PAGE 14

## VI.
### CAUSES OF ACTION

### FIRST CAUSE OF ACTION – AVOIDANCE OF FRAUDULENT OBLIGATIONS

30.     The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

31.     In the unlikely event that any or all of the GOZ Guarantees, M2M2 Guaranty and M2M3 Guaranty are determined to be valid contractual obligations owed by AHF to Miller, such obligations should be avoided as fraudulent (the "**Fraudulent Obligations**") under section 548 of the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act.

32.     Pursuant to section 544(b) of the Bankruptcy Code, the Trustee has the rights of an existing unsecured creditor of AHF.  Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that such creditor could assert under applicable state law.

33.     At all times relevant herein the Trustee in his capacity as such was and is a creditor of AHF.

34.     In furtherance of the scheme to manufacture illegitimate tax losses and deductions, on or within four (4) years (in some instances) or two (2) years (in other instances) of the Petition Date, AHF incurred each Fraudulent Obligation.

35.     The Fraudulent Obligations were incurred with the actual intent to hinder, delay, or defraud then and future creditors of AHF.

36.     AHF received less than reasonably equivalent value in exchange for each of the Fraudulent Obligations.

37.     AHF was insolvent at the time it incurred each of the Fraudulent Obligations.

38.    At the time each of the Fraudulent Obligations was incurred, AHF was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

39.    At the time each of the Fraudulent Obligations was incurred, AHF intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

40.    The Fraudulent Obligations are, therefore, avoidable as such under sections 548(a)(1)(A) and (a)(1)(B) of the Bankruptcy Code and TEX. BUS. & COMM. CODE § 24.005.

### SECOND CAUSE OF ACTION – MANDATORY SUBORDINATION OF THE MILLER CLAIM

41.    The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

42.    Pursuant to the provisions of section 510(b) of the Bankruptcy Code, the Miller Claim should be subordinated to the allowed claims of legitimate general unsecured creditors for purposes of distribution as the Miller Claim arises from the purchase or sale of a security of an affiliate of AHF.

### THIRD CAUSE OF ACTION – EQUITABLE SUBORDINATION OF THE MILLER CLAIM

43.    Miller engaged in inequitable conduct, including conduct described in this Complaint, that has resulted in injury to creditors or the conferring of an unfair advantage on or to him. This inequitable conduct has resulted in harm to the AHF bankruptcy estate and its entire creditor body. Accordingly, pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code, all claims asserted by, on behalf of, or for the benefit of Miller or his affiliates or related entities against AHF should be equitably subordinated to the allowed claims of legitimate general

unsecured creditors for distribution purposes because Miller's claims arise from improper conduct in the form of illegitimate and improper tax activities.

44.     The Trustee cannot at this time identify every one of the claims that have been filed that may, indirectly, be for the benefit of or on behalf of Miller or his affiliates or related entities because information necessary to make this determination is exclusively in the possession of others. The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, that are asserted or sought by Miller or his affiliated or related entities, directly or indirectly, are subordinated pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code. No funds that would otherwise be paid to general unsecured creditors should be paid to Miller, his affiliates, or his related entities.

### FOURTH CAUSE OF ACTION – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS

45.     The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

46.     AHF and/or AHF Development, Ltd. ("**AHF Development**") paid or caused to be paid, and Miller received, the sum of approximately $312,635.70, which includes, without limitation, the transfers listed on the attached Exhibit A (collectively, the "**Transfers**").

47.     At all times relevant herein, the Trustee in his capacity as such was and is a creditor of AHF and/or AHF Development.

48.     Each Transfer was made at various times within four years of the Petition Date.

49.     Each Transfer was made with the actual intent to hinder, delay, or defraud then and future creditors of AHF and/or AHF Development.

50.     In exchange for each Transfer, AHF and/or AHF Development did not receive reasonably equivalent value.

51.     When each Transfer was made, AHF and/or AHF Development were engaged or about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

52.     AHF and/or AHF Development were insolvent when each Transfer was made.

53.     Each Transfer was received by Miller with knowledge that AHF and/or AHF Development intended to hinder, delay, or defraud their then and future creditors.

54.     The Transfers are, therefore, avoidable under section 548(a)(1)(A) and (a)(1)(B) of the Bankruptcy Code and TEX. BUS. & COMM. CODE § 24.005

55.     To the extent the Transfers are avoided under sections 544 or 548 of the Bankruptcy Code, under section 550 of the Bankruptcy Code, the Trustee may recover the value of the Transfers from the transferees of the Transfers for the benefit of AHF's and/or AHF Development's bankruptcy estate(s).

### FIFTH CAUSE OF ACTION – DISALLOWANCE OF MILLER CLAIM UNDER 11 U.S.C. § 502(D)

56.     The Trustee realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

57.     By reason of the facts alleged in this Complaint, pursuant to section 502(d) of the Bankruptcy Code, all claims asserted by Miller, his affiliates, or his related entities must be disallowed unless he has turned over to the Trustee the property transferred, or paid to the Trustee the value of such property for which he is liable to the Trustee, under section 550 of the Bankruptcy Code.

58.     To the extent the Transfers are avoided under sections 544 or 548 of the Bankruptcy Code, under section 550 of the Bankruptcy Code, the Trustee may recover the value of the Transfers from the transferees of the Transfers for the benefit of AHF's bankruptcy estate.

## VII.
### REQUEST FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in his

favor and against Miller as follows::

(i)     ordering that the Miller Claim is disallowed in its entirety for all purposes;

(ii)    in the alternative, ordering that the Fraudulent Obligations are avoided and set aside;

(iii)   further in the alternative, ordering that any allowed portion of the Miller Claim is subordinated to the allowed claims of general unsecured creditors for distribution purposes;

(iv)    avoiding and setting aside the Transfers;

(v)     ordering that Miller must return the Transfers to the Debtor's estate or pay the Debtor's estate the value thereof;

(vi)    conditioning the award of any equitable relief upon a showing that claimant has "clean hands" and has not been involved in any inequitable conduct;

(vii)   ordering that the Miller Claim is disallowed until the Transfers or the value thereof, for which Miller is liable under section 550 of the Bankruptcy Code, have been returned to the Debtor's estate;

(viii)  awarding the Trustee his attorneys' fees and costs of suit; and

(ix)    awarding the Trustee all such other and further relief, at law or in equity, to which he may be justly entitled.

Dated: May 12, 2011

Respectfully submitted,

Max R. Tarbox (TX 19639950)
Tarbox Law, P.C.
2301 Broadway
Lubbock, Texas 79401
Phone: (806) 686-4448
Fax:    (806) 368-9785

and

*/s/ Marcus A. Helt*
Stephen A. McCartin (TX 13374700)
Marcus A. Helt (TX 24052187)
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas  75201-4761
Telephone:  214.999.3000
Facsimile:  214.999.4667
smccartin@gardere.com
mhelt@gardere.com

**COUNSEL FOR
WALTER O'CHESKEY, TRUSTEE OF
THE AHF LIQUIDATING TRUST**

TRUSTEE'S SECOND AMENDED COMPLAINT AGAINST DAVID MILLER TO AVOID GUARANTEES AS
FRAUDULENT OBLIGATIONS, TO SUBORDINATE ALLOWED CLAIMS, AND TO AVOID
AND RECOVER FRAUDULENT TRANSFERS, TOGETHER WITH OBJECTIONS TO CLAIMS        PAGE 20

DALLAS 2227350v.1

# EXHIBIT A

**Transferee: David Mille**

| Date | Date Range | Check # | Total | Transferor |
|------|-----------|---------|-------|-----------|
| 1/5/2007 | Between 2-4 Yrs | 1542 | 30,000.00 | AHF Development LTD |
| | | Total | 30,000.00 | |
| | | | | |
| 6/20/2007 | Between 1-2 Yrs | Check | 596,112.33 | AHF/Houston One Willow Chase LTD |
| 07/18/07 | Between 1-2 Yrs | 1700 | 223,013.70 | AHF Development LTD |
| | | Total | 819,126.03 | |
| | | | | |
| | **Grand Total** | | $  849,126.03 | |