

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed March 30, 2013**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AMERICAN HOUSING FOUNDATION, | § | Case No. 09-20232-RLJ-11 |
| | § | |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| WALTER O'CHESKEY, Chapter 11 Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 10-02016 |
| | § | |
| ROBERT L. TEMPLETON, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court conducted a trial in the above-captioned adversary proceeding on the following

dates: September 14 and 15, 2011; October 17, 18, 24, 25, and 26, 2011; January 11 and 12,

2012; February 14, 15, and 16, 2012; March 8 and 9, 2012; April 4, 5, 17, and 18, 2012; May 16

and 17, 2012; June 19 and 20, 2012; July 30 and 31, 2012; and August 21, 2012.  Appearing at

trial were counsel for Walter O'Cheskey, the appointed and acting trustee (the "Trustee") for the AHF Liquidating Trust, counsel for the defendant, Robert L. Templeton ("Templeton"), and other appearances as noted in the record.

Based upon the record, the Court now finds and concludes as follows, pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. FINDINGS OF FACT

**A.     AHF Bankruptcy**

1.      On April 21, 2009, certain alleged creditors of the debtor, American Housing Foundation ("AHF"), filed an involuntary petition against the debtor pursuant to chapter 11 of the Bankruptcy Code, thereby initiating an involuntary bankruptcy case [Case No. 09-20232] (the "Involuntary Case") against AHF.  On June 11, 2009, AHF filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code, initiating a voluntary case [Case No. 09-20373] (the "Voluntary Case").

2.      On July 17, 2009, the Court entered its *Agreed Order Granting Motion to Consolidate Bankruptcy Cases* [Docket No. 88; Case No. 09-20232], consolidating the Voluntary Case and the Involuntary Case into a single case (the "Bankruptcy Case") pursuant to Bankruptcy Rule 1015(a).

3.      On April 29, 2010, this Court entered the *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 1104; Case No. 09-20232].

4.      On December 8, 2010, this Court entered its *Findings of Fact, Conclusions of*

- 2 -

*Law, and Order Confirming Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1918; Case No. 09-20232] (the "Confirmation Order"), confirming the *Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1909; Case No. 09-20232] (the "Plan").

**B.    Templeton Claims**

5.    Templeton filed an original proof of claim on October 5, 2009, designated as Claim No. 76-1 on the Bankruptcy Clerk's claims register in Case No. 09-20232-11; he amended this claim four times, on October 7, 2009 [Claim No. 76-2], on November 18, 2010 [Claim No. 76-3], on September 7, 2011 [Claim No. 76-4], and on October 7, 2011 [Claim No. 76-5].  The proof of claim, as originally filed, stated that the amount owed to Templeton was based on six separate investments, which are summarized as follows:

| Entity | Amount Invested |
| --- | --- |
| GOZ No. 1, Ltd. | $250,000 |
| LIHTC Walden II Development, Ltd. | $3,500,000 |
| WI Hurike, Ltd. | $200,000 |
| AHF Gray Ranch, Ltd. | $250,000 |
| LIHTC-M2M No. 2, LP | $450,000 |
| LIHTC-M2M No. 3, LP | $200,000 |
| Total Invested: | $4,850,000 |
| Interest alleged: | $449,853.41 |
| Attorney Fees & Cost: | $133,657.06 |

Total Claim: $5,433,510.47

6.      The fourth amended claim [Claim No. 76-5] (hereinafter, the "Templeton Claim"), filed on October 7, 2011 after trial began, is based on five separate investments, set forth as follows:

| Entity | Amount Owed |
|---|---|
| GOZ No. 1, Ltd. | $256,885.52 |
| LIHTC-M2M No. 2, LP | $623,793.16 |
| LIHTC-M2M No. 3, LP | $205,512.90 |
| LIHTC Walden II Development, Ltd. | $3,786,339.34 |
| AHF Gray Ranch, Ltd. | $256,885.52 |
| Total: | $5,129,416.44 |
| Less Offsets & Credits: | $382,896.33 |
| Total Claim: | $4,746,520.11 |

The above amounts for each investment include interest, attorneys' fees, and costs.

**C.      Trustee's Objections to Templeton Claims and Assertion of Avoidance Actions**

7.      On August 31, 2010, the Trustee filed the *Trustee's Complaint Against Robert L. Templeton to Avoid Guaranty as Fraudulent Obligation and to Subordinate Allowed Claims, Together With Objections to Claims* [Docket No. 1, Adversary No. 10-02016],[1] thereby initiating this adversary proceeding against Robert Templeton (the "Templeton Adversary").

8.      On October 1, 2010, Templeton filed *Robert L. Templeton's Motion to Dismiss*

---

[1]Additional docket references refer to Adversary No. 10-02016, unless otherwise noted.

*Trustee's Complaint Pursuant to Rule 12(b)(6), and 9(b)* [Docket No. 7] ("Templeton's Motion to Dismiss"). Templeton's Motion to Dismiss was denied January 14, 2011 [Docket No. 31].

9.      On April 4, 2011, the Trustee filed the *Trustee's First Amended Complaint Against Robert L. Templeton to Avoid Guarantees as Fraudulent Obligations, to Subordinate Allowed Claims, and to Avoid and Recover Fraudulent and Preferential Transfers, Together with Objection to Claims* [Docket No. 52].

10.     On January 27, 2011, Templeton filed the *Original Answer and Counterclaim for Declaratory Judgment of Robert L. Templeton* [Docket No. 40].

11.     On February 17, 2011, the Trustee filed *Plaintiff's Answer to Defendant Robert L. Templeton's Counterclaim for Declaratory Judgment and Affirmative Defenses* [Docket No. 41].

**D.      The Templeton Deals[2]**

**GOZ No. 1, Ltd.**

12.     By his proof of claim, as amended, Templeton alleges the following:

   •      He invested $250,000 in GOZ No. 1, Ltd. ("GOZ No. 1") on or about
          March 1, 2006;

   •      He executed a GOZ No. 1 limited partnership agreement (attached as
          Exhibit A-2 to the Templeton Claim); and

   •      On March 1, 2006, AHF executed "an . . . unconditional . . . guaranty of
          payment" of Templeton's $250,000 investment (a copy of the guaranty is
          attached as Exhibit A-4 to the Templeton Claim).

13.     On February 24, 2006, Steve W. Sterquell ("Sterquell"), acting as President for

---

[2]The "Templeton Deals" shall refer to the GOZ No. 1, Ltd. investment, the LIHTC Walden II Development, Ltd. investment, the WI-HURIKE, Ltd. investment, the AHF Gray Ranch, Ltd. investment, the LIHTC M2M No. 2, LP investment, and the LIHTC M2M No. 3, LP investment.

AHF, created GOZ No. 1 by filing a Certificate of Formation of Limited Partnership with the Texas Secretary of State's Office.

14.     On or about March 1, 2006, Templeton made a $250,000 investment in GOZ No. 1.

15.     Templeton executed a limited partnership agreement and became a limited partner in GOZ No. 1.

16.     The original general partner of GOZ No. 1 was AHF-GOZ, Inc., with Sterquell acting as president.

17.     Effective March 1, 2006, Templeton executed a limited partnership subscription agreement in which Templeton accepted from AHF the assignment of 49.5% of the limited partnership interest.  A subscription agreement appointed AHF as the partnership's general partner and Templeton's attorney-in-fact.

18.     On or about March 1, 2006, Sterquell, as President of AHF, executed a guaranty agreement in connection with the GOZ No.1 investment.  The guaranty provides that "Guarantor agrees to pay, when due or declared due as provided in the Loan Documents, the Guaranteed Investment to Investor."  Templeton Claim, Exhibit A-4.

19.     According to the Templeton Claim, on or about April 24, 2006, Sterquell executed and delivered to Templeton additional documentation of the agreement to guarantee repayment of the investment on behalf of himself and AHF.  Templeton Claim, Exhibit A-5.

20.     Exhibit A-5 does not constitute a guaranty by AHF of any obligation.

21.     Templeton made a $250,000 check payable to AHF, which was deposited into

AHF's account number XXXX-XX9525 on March 10, 2006. These funds were transferred to AHF affiliated accounts, and various bills and creditors of AHF and its affiliates were paid; the funds did not directly benefit GOZ No. 1.

22.     Sometime in 2008, Templeton gifted his limited partnership interest in GOZ No. 1. Templeton contends that this gift did not include a release of AHF's obligation to pay the guaranteed investment.

23.     Though the guaranty refers to "Loan Documents" as identifying the obligation being guaranteed, the GOZ No. 1 deal has no documents that identify or evidence a loan; Templeton made only a purported equity investment in GOZ No. 1.

24.     The partnership agreement contains no provision requiring that the partnership retain the $250,000 capital contribution at any time; it likewise contains no accrued-interest, preferred-return, or attorney's fee provisions.

**LIHTC Walden II Development, Ltd.**

25.     By the Templeton Claim, Templeton asserts that he invested the following amounts on the following dates in LIHTC Walden II Development, Ltd. ("Walden II"):

| | |
|---|---|
| $2,000,000 | August 31, 2007 |
| $500,000 | January 25 2008 |
| $1,000,000 | May 19 2008 |

[Templeton Claim, Exhibits D-1, D-2, D-3, D-5, and D-6].

26.     Templeton further describes his August 31, 2007, investment of $2,000,000 as follows:

•       $500,000 of unpaid principal owed to Templeton by AHF Development, Ltd. on a promissory note (guaranteed by AHF);

- • $225,907 for return of investment plus contract rate of return owed to Templeton by LIHTC-M2M No. 3, LP;

- • $609,748 for return of investment plus the contractual rate of return owed to Templeton by LIHTC-M2M No. 2, LP;

- • $664,345 in cash funds represented by Templeton's checks on or about August 31, 2007.

*See* Templeton Claim ¶ 31.

27. On approximately August 31, 2007, Templeton executed an agreement of limited partnership and became a limited partner.

28. The partnership agreement also provides that the limited partners are entitled to a return of their initial capital contribution within 12 months of making the contribution.

29. The partnership agreement further provides that the limited partners are entitled to a preferential return on investment of eighteen percent (18%) per annum "payable quarterly beginning on date three months after the effective date of this Agreement on its Initial Capital Contribution." This return is to be paid "up to and until said Initial Capital Contribution is returned in full."

30. "Initial Capital Contribution" is defined in section 1.6(e) of the Walden II partnership agreement as "the amount of cash, and the fair market value of property or services, contributed to the Partnership by a Partner, **prior to the Effective Date**." Walden II Partnership Agreement, § 1.6(e) (emphasis added).

31. The "Effective Date" is defined in section 1.6(d) of the partnership agreement as "the date the Certificate of Limited Partnership . . . is filed with the Secretary of State of Texas." Walden II Partnership Agreement, § 1.6(d).

32.     The "Certificate of Limited Partnership" was filed with the Secretary of State of Texas on August 20, 2007.

33.     Templeton next invested $500,000 in Walden II on or about January 25, 2008 under the same partnership terms noted above.

34.     Templeton made a subsequent $1,000,000 investment in Walden II on or about May 19, 2008, under the same partnership terms noted above.

35.     On August 20, 2007, January 24, 2008, and May 15, 2008, as part of the consideration for Templeton's investments, Sterquell, as president of AHF, executed "unconditional guarant[ies]" of the payment obligation contained in the partnership agreement.

36.     On September 5, 2007, January 26, 2008, and May 15, 2008, Templeton's investment funds were deposited into AHF's account XXXX-XX9525.

37.     The Templeton Claim asserts that AHF "executed unconditional guarantees **of the payment obligation contained in the Partnership Agreement.**"  Templeton Claim ¶ 38 (emphasis added).  In fact, the guaranty agreements each provide that "Guarantor guarantees the performance of [Walden II]'s **obligations under Article VI of the Agreement**."  *See* Templeton Claim, Exhibits D-7, D-8, and D-9 ¶ 1(emphasis added).  There were no "Initial Capital Contributions" made prior to August 20, 2007.

**WI-HURIKE, Ltd.**

38.     By Templeton's original proof of claim [Claim No. 76-1, Case No. 09-20232], Templeton alleged that:

> •    he loaned $200,000.00 to WI-HURIKE, Ltd. ("Hurike") on December 16, 2008, evidenced by a promissory note.  A copy of that promissory note is attached as Exhibit L to the original Templeton claim;

- on December 16, 2008, AHF executed an unconditional guaranty (the "Hurike Guaranty") of "payment and performance" of the promissory note. A copy of that guaranty is attached as Exhibit N to the original Templeton claim; and

- he is owed $208,909.74 under the promissory note for principal and interest, plus $5,512.88 in attorneys' fees.

39.     On November 25, 2008, Sterquell, acting as President for AHF, created Hurike by filing a Certificate of Formation of Limited Partnership with the Texas Secretary of State's Office.

40.     On or about December 16, 2008, Hurike made and delivered to Templeton a promissory note in the principal amount of $200,000, together with accrued interest at the rate of twelve percent (12%) per annum from December 16, 2008 to April 1, 2009, the maturity date.

41.     On or about December 16, 2008, Sterquell, as President of AHF, executed an "absolute, irrevocable, unconditional, and continuing guaranty of payment and performance" of "[t]he debt evidenced by the Note dated December 16th, 2008, in the original principal amount of $200,000 executed by [Hurike] and payable to the order of [Templeton]."

42.     Templeton also became a limited partner in Hurike and executed an agreement of limited partnership.  AHF was the general partner of Hurike.

43.     Templeton also executed a subscription agreement in which Templeton accepts from Hurike a 50% limited partnership interest.  The subscription agreement appoints AHF as the partnership's general partner and Templeton's attorney-in-fact.

44.     Exhibit M to the original Templeton claim is a $200,000 check from Martha

- 10 -

Templeton, Templeton's wife, stating the check was for "5% WI-HURIKE, Ltd." Exhibit N to the original Templeton claim says that AHF guarantees the "[t]he debt evidenced by the Note dated December 16th, 2008, in the original principal amount of $200,000 . . . ."

45.     On December 16, 2008, the $200,000 was deposited into AHF's account number XXXX-XX9525.

46.     In addition, Templeton was issued a "Schedule K-1 (Form 1065)"[3] for tax year 2008. The K-1 shows Templeton to be a limited partner of Hurike. In that K-1, prepared in 2009, Templeton was allocated a tax loss of $2,513,028 for his equity investment in Hurike.

**AHF Gray Ranch, Ltd.**

47.     By the Templeton Claim, Templeton alleges that:

- he invested $250,000 in AHF Gray Ranch, Ltd. ("Gray Ranch") on or about May 27, 2008;

- he executed a limited partnership agreement (attached as Exhibit E-2 to the Templeton Claim); and

- on May 23, 2008, AHF executed an unconditional guaranty (the "Gray Ranch Guaranty") of the payment obligation contained in the partnership agreement (a copy of the Gray Ranch Guaranty is attached as Exhibit E-3 to the Templeton Claim).

48.     On May 8, 2008, Sterquell, acting as President for AHF, created Gray Ranch by filing a Certificate of Formation of Limited Partnership with the Texas Secretary of State's Office.

49.     On or about May 27, 2008, Templeton made a $250,000 investment in Gray

---

[3]A Schedule K-1 (Form 1065) is submitted to the Internal Revenue Service to show how much an owner/partner of a business (taxed as a partnership) reports as his/her share of the business's income, gain, loss, deduction, credit, etc. A business taxed as a partnership does not pay income tax but "passes through" any profits or losses to its owners/partners. Owners/partners must include partnership items—income, gains, losses, deductions—on their tax returns. A Schedule K-1 (Form 1065) is not submitted for creditors, because creditors do not receive tax losses and deductions—and their favorable tax treatment—like owners/partners.

Ranch.

50.      Templeton executed a limited partnership agreement and became a limited

partner.

51.      On or about May 23, 2008, as part of the consideration for Templeton's

investment, Sterquell, as President of AHF, executed a guaranty agreement.

52.      The guaranty provides that "Guarantor agrees to pay, when due or declared due as

provided in the **Loan Documents**, the Guaranteed Investment to investor."  *See* Exhibit E-3 to

the Templeton Claim (emphasis added).

53.      There are no "Loan Documents."  There is only an equity investment in Gray

Ranch.

54.      The Gray Ranch partnership agreement contains **no** provision requiring the Gray

Ranch partnership to return the $250,000 at any time.  Likewise, it contains no accrued-interest,

preferred-return, or attorney's fee provisions.

**LIHTC-M2M No. 2, LP**

55.      By the Templeton Claim, Templeton alleges that:

- he invested $450,000 in LIHTC-M2M No. 2, LP ("M2M2") on or about April 24, 2006 [Templeton Claim, Exhibit B-1];

- he executed a limited partnership agreement (attached as Exhibit B-2 to the Templeton Claim);

- he executed an agreement regarding investments (attached as Exhibit B-3 to the Templeton claim) providing that M2M2 guaranteed a return of a portion of his investment in M2M2; and

- on April 24, 2006, Sterquell (and presumably, by extension, AHF) executed an agreement guaranteeing the return of Templeton's investment

in M2M2 (the "M2M2 Guaranty") (a copy of this purported guaranty is attached as Exhibit B-4 to the Templeton Claim).

56. On February 24, 2006, Sterquell, acting as President for AHF, created M2M2 by filing a Certificate of Formation of Limited Partnership with the Texas Secretary of State's Office.

57. On or about April 24, 2006, Templeton made a $450,000 investment in M2M2.

58. Templeton executed a limited partnership agreement and became a limited partner.

59. The original general partner of M2M2 was AHF-M2M, Inc., with Sterquell acting as president.

60. On or about April 24, 2006, Templeton entered into an agreement regarding investments with M2M2 that provides:

> A. The Partnership and the Investors have agreed that the Investors will make investments (the "Investments") with the Partnership in an aggregate amount equal to $50,000 times the number of apartment complexes (the "Complexes") purchased by American Housing Foundation, a Texas non-profit corporation ("AHF") or a subsidiary of AHF under purchase and sale agreements with Apartment Investment and Management Company ("AIMCO") or affiliates of AIMCO.
>
> B. The number of Complexes to be purchased by AHF or a subsidiary of AHF from AIMCO or affiliates of AIMCO is currently estimated to be eighteen (18).
>
> C. The Investments will be used by the Partnership in (1) acquiring the Complexes from AHF or a subsidiary of AHF, and (2) renovating the Complexes.

Trustee's Exhibit 108.

61. The agreement regarding investments further provides:

> The Partnership guarantees that the Investors will receive (a) the return of a portion of their Investments in an amount equal to $37,500.00 times the number of Complexes acquired by the Partnership (the "Guaranteed Amount") within twelve (12) months after date the Partnership acquires the Complexes, and (b) 12% per annum on the Guaranteed Amount.

*Id.*

62.     AHF or another entity under its control, acting under the direction of Sterquell, acquired several complexes from AIMCO or affiliates of AIMCO.  Those complexes were either (a) in fact acquired by AHF or its entities as agent for the partnership; or (b) owned by the partnership in equity.

63.     At some point before December 31, 2007, AHF became the general partner of M2M2.

64.     Templeton made a $450,000 check payable to AHF, which was deposited into AHF's account number XXXX-XX9525 on April 28, 2006.

65.     Exhibit B-4 to the Templeton Claim is not a guaranty.  It states nowhere on its face that Templeton is guaranteed the return of his $450,000 equity investment in M2M2 by Sterquell or AHF.  Moreover, the purported guaranty is not executed by AHF, but rather by Sterquell in his individual capacity.  The M2M2 partnership agreement contains **no** provision requiring the M2M2 partnership to return the $450,000 at any time.  Likewise, it contains no accrued-interest, preferred-return, or attorney's fee provisions.  The agreement regarding investments does guaranty that M2M2—*not AHF*—will return a portion of Templeton's investment, but not the entire $450,000 as Templeton claims, and without interest and attorneys' fees.

- 14 -

66.     Templeton transferred by gift his 49.5% interest in M2M2 to AHF, purportedly on December 31, 2008; he actually signed the gift instrument on March 30, 2009, two days before Sterquell's death, but the document was dated "effective" December 31, 2008. *See* Trustee's Exhibit 117.

### LIHTC-M2M No. 3, LP

67.     By the Templeton Claim, Templeton alleges that:

- he invested $200,000 in LIHTC-M2M No. 3, LP ("M2M3") on or about May 25, 2008;

- he executed a limited partnership agreement (attached as Exhibit C-2 to the Templeton Claim); and

- on May 23, 2008, AHF "executed . . . an unconditional guarantee of the payment obligation contained in the Partnership Agreement" (the "M2M3 Guaranty"). A copy of the M2M3 Guaranty is attached as Exhibit C-3 to the Templeton Claim.

68.     On February 24, 2006, Sterquell, acting as President of AHF, created M2M3 by filing a Certificate of Formation of Limited Partnership with the Texas Secretary of State's Office.

69.     On or about August 6, 2006, Templeton made a $200,000 initial investment in M2M3.

70.     Templeton executed a limited partnership agreement and became a limited partner.

71.     The original general partner of M2M3 was AHF-M2M, Inc., with Sterquell acting as president.

72.     Sterquell, as president of AHF, executed a guaranty concerning Templeton's

- 15 -

investment in M2M3. The guaranty is dated May 23, 2008, the same date as Templeton's reacquisition of the interest. The M2M3 Guaranty provides that "Guarantor agrees to pay, when due or declared due as provided in the **Loan Documents**, the Guaranteed Investment to investor." *See* Exhibit C-3 to the Templeton Claim (emphasis added). There are no "Loan Documents." There is only an equity investment in M2M3. The M2M3 partnership agreement contains *no* provision requiring the M2M3 partnership to return the $200,000 at any time. Likewise, it contains no accrued-interest, preferred-return, or attorney's fee provisions. The M2M3 Guaranty references nonexistent "Loan Documents."

73.     Templeton made two $100,000 checks payable to M2M3. On May 27, 2008, these funds were deposited into AHF's account number XXXX-XX9525.

**E.     Sterquell's Death**

74.     Sterquell died on April 1, 2009, in a car crash that was ruled to be a suicide.

**F.     Other Relevant Facts**

75.     With respect to the M2M2 investment, the instrument that Templeton contends is a guaranty from AHF recites as follows: "[i]f the property is converted using 4% LIHTC [Templeton] will receive 60% annualized return on [his] investment. If the property is converted using 9% LIHTC [Templeton] will receive 100% annualized return on [his] investment. In both of the LIHTC scenarios [Templeton's] funds are guaranteed and will earn at least 12% annualized." Trustee Exhibit 109.

76.     In the Walden II investment, there was no evidence that Templeton assigned the note receivable from AHF Development, Ltd. to Walden II in return for his investment in Walden

II. More important, there is no evidence that AHF Development, Ltd. had *any* ability to pay such note.

77.     AHF Development, Ltd. was an entity controlled by AHF and Sterquell and used by AHF and Sterquell as a conduit bank account.

78.     The $225,907 credit that was moved over from M2M3 arises from his investment in M2M3 of $200,000 for a 42.5% interest in such partnership. There is no evidence that such interest was transferred by Templeton to Walden II. In addition, there is no evidence that such interest had any value, much less a value of over $225,000.

79.     The "crediting" of the $609,748 from M2M2 is similarly devoid of substance. Again, there is no evidence of either Templeton's contribution of his interest to Walden II or that such interest has any value, much less a value of over $600,000.

80.     As to the three "credits," there is no evidence that each of the entities that was obligated to Templeton (either as a lender or interest holder) redeemed such interest or obligation and paid Walden II on Templeton's behalf.

81.     Despite the voluminous documents and instruments prepared for the creation of the Templeton Deals, there are no documents or other evidence backing the so-called crediting or rolling of Templeton's investments into Walden II.

82.     In 2007, Templeton had a $8.383 million capital gain from a sale of an entity, Luxor Oil and Gas, in which he had previously invested. In the same year, 2007, Templeton took a $2.244 million charitable contribution deduction that ostensibly flowed to him from M2M2. *See* Trustee's Exhibit 115. His only investment in M2M2 was the $450,000 contribution made in April 2006. His initial interest in M2M2 was 42.5% but increased to 49.5%. Templeton had no

explanation for the tax deduction; he did not know of any property that was charitably donated by M2M2 that would give rise to the $2.244 million deduction, much less any property that would be of such a value that would generate a deduction of that amount for a 49.5% interest owner who had put in, at most, $450,000.  Templeton testified that the deduction was improper and that he would be amending his tax return to remove the deduction.

83.    A K-1 was issued from GOZ No. 1, ostensibly to Templeton, reflecting a passed-through loss of $1,174,371.  This loss was for the year 2007 and arose from Templeton's investment made in 2006 for $250,000 for a 49.5% interest in GOZ No. 1.  Templeton testified that he did not recall receiving or seeing this K-1, and, in fact, he did not claim such loss on his 2007 personal tax return.  Such loss would not have been legitimate had it been taken.  Templeton testified that it was illegitimate and was simply part of Sterquell's fraud in his promising generous tax deductions for investments in the various Templeton Deals.

84.    With respect to M2M3, two amendments were made to the partnership agreement. By the first amendment, Templeton transferred his interest in M2M3 to another entity on May 1, 2007.  Then, a year later, May 2008, the interest was reacquired.  Templeton submits that the redemption of his interest in M2M3 was paid for by "rolling" what was owed to him by M2M3 ($225,907) into his investment in Walden II.  There were no documents evidencing the rolling of such obligation.

85.    In connection with the GOZ No. 1 deal, Templeton signed a nonrecourse promissory note on March 30, 2009, which reflects a principal amount of $924,371.  *See* Trustee's Exhibit 222.  The note is dated January 1, 2008.  The "lender" under the note is AHF, and the note recites that the principal amount is payable solely from the proceeds of GOZ No. 1.

Templeton testified that he signed this note at the behest of Sterquell and that it was needed for tax purposes. On the same date, Templeton signed another back-dated, nonrecourse promissory note, also concerning GOZ No. 1, in the principal amount of $1,872,466. AHF is named as the "lender" on the note, and the note recites that it will pay the principal amount to the lender but such amount is payable solely from the proceeds from "Student Care Foundation."

86.     Other instruments were signed on the same day in connection with the two nonrecourse promissory notes, including investor security agreements. Templeton could not explain these instruments and attempted to disavow that he even read the instruments at the time he signed them.

87.     Templeton was issued a K-1 from Hurike reflecting a passed-through loss of $2,513,028 for tax year 2008. This arose from his interest in Hurike from the $200,000 investment he made in Hurike in 2008—in *December 2008*. Despite this, the K-1 reflected Templeton's investment as $2,513,028. Templeton testified that his investment in Hurike was, obviously, based on Sterquell's solicitation. He explained his exchange with Sterquell as follows: "[h]e initially told me . . . I would receive a million dollar deduction. . . . and that I wouldn't have to put up any money. And that just sounded - - I mean, that just sounded wonderful." Trustee's Exhibit 434. Templeton then explained his additional $200,000 investment in Hurike as somehow based on a program arising from Hurricane Katrina. He stated as follows: "And so, we had a conversation along in December. And I said, . . . what is the deduction that's available on that? And he says, well, if you'll put up $200,000, I'll allow you another million dollar deduction. So I put up the $200,000 and he gave me a note, I believe, for the $200,000." *Id.*

88.    From the Templeton Deals, Templeton took the following deductions (loss or charitable) in 2007: $2,689,828 from M2M2 and $1,199,964 from Walden II.  He took the following deductions in 2008: $1,500,000 from Walden II; $2,513,028 from Hurike; and $198,000 from M2M3.  The losses and charitable donation deductions passed through to Templeton from the named partnership.  Such losses and charitable donations were not legitimate.


89.    From May of 2005 through February 2, 2009, Templeton and his wife, Martha Templeton, received transfers from the AHF Development, Ltd. account of over $1.3 million.  Within the ninety days prior to the filing of the AHF Bankruptcy Case, they received $157,500.

90.    Templeton is an experienced trial lawyer.  He has been actively practicing law since he graduated from law school in 1954.  He has received many awards and recognitions as a lawyer.  His main practice areas are personal injury and medical malpractice, but he also has significant experience in commercial litigation, particularly in the oil and gas area and business fraud cases.  His grasp of the complex business structure of the AHF enterprise and its many complicated transactions was apparent from his testimony.  He understands the differences in corporate and other legal forms and the different tax and liability implications that flow from them.  He understands the general and technical, legal differences between loans and equity investments.

91.    The law firm with which Templeton is affiliated, Templeton Smithee Hayes Heinrich & Russell, LLP, did on occasion represent AHF in litigation matters.  It did not represent AHF on a routine or regular basis, however.

## II. CONCLUSIONS OF LAW

**A.     Jurisdiction and Venue**

1.     The Court has jurisdiction over this Complaint and the causes of action asserted herein under 28 U.S.C. §§ 157(a) and (b) and 1334.

2.     The causes of action asserted herein are core proceedings under 28 U.S.C. § 157(b).

3.     Venue of this action is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     This Court has the power and is authorized to provide the requested relief pursuant to §§ 105, 502, 510(b), 510(c), 544, 547(b), 548, and 550 of the Bankruptcy Code.

**B.     Characterization of the Templeton Deals**

5.     Templeton's claim, as originally filed for $5,433,510.47, arose from the six Templeton Deals.  His amended claim for $4,746,520.11 arose from five of the six Templeton Deals; Templeton dropped his Hurike investment in the amended claim.  The Templeton Claim as based on the Templeton Deals is characterized by the Trustee as a contract claim.  Templeton identifies such claim as his liquidated, unsecured claim.  The Trustee attacks the Templeton Claim in a waterfall fashion.  The Trustee first asserts that each of the AHF guaranties that form a part of each of the Templeton Deals are invalid given the actual terms of each of the guaranties.  The Trustee then attacks Templeton's claim as avoidable obligations under §§ 548(a)(1)(A) (actual fraud) and 548(a)(1)(B) (constructive fraud).  Regarding the § 548 claims, the Trustee contends Templeton cannot avail himself of the good faith defense under § 548© given his involvement in the illegitimate tax scheme orchestrated by Sterquell.  The Trustee next contends that

- 21 -

Templeton's claim should be equitably subordinated under § 510© of the Bankruptcy Code. If not equitable subordination, the Trustee contends Templeton's claim is subject to mandatory subordination under § 510(b).

6.     To side-step the Trustee's waterfall of contentions, Templeton also asserts an unliquidated claim based on theories of fraud, breach of fiduciary duty, money had and received, securities fraud, and civil theft. He also asserts a constructive trust and equitable lien, though these theories were not raised at trial and there simply is no evidence supporting such claims.

7.     The Templeton Deals and the Templeton Claim are, at the most basic level, based on Templeton having entrusted his funds with Sterquell. Sterquell controlled AHF; anything AHF did was through Sterquell. However, it cannot be said that anything Sterquell did was attributable to AHF. Apart from running AHF, Sterquell was also a CPA and a principal in his accounting firm, Sterquell Hill & Goelzer LLP.

8.     Each of the Templeton Deals was an investment on Templeton's part. Throughout Templeton's testimony and throughout his pleadings, he referred to his "investments." Characterizing the Templeton Deals beyond that is difficult.

9.     AHF (and Sterquell) was not, as suggested by Templeton, analogous to a stock broker who has in some fashion defrauded his clients into making investments into nonexistent or bogus products. Each investment here involved the creation of the very structure needed to support the investment, i.e., the simultaneous creation of the limited partnership and the sundry instruments required for the creation of the limited partnership and the conveyance of the limited partnership interests to Templeton. AHF is part of each deal through guaranties signed by Sterquell for AHF. (As set forth in the Findings of Fact, the so-called guaranty issued on the

M2M2 investment cannot, even upon a charitable interpretation, be considered a valid, enforceable guaranty.)

10.     The Templeton Deals frustrate legal analysis.  On each of the Templeton Deals, Templeton received a defined partnership interest in a newly created partnership.  In each deal, Templeton was a major investor.  For the same investment dollars, Templeton received a guaranty from AHF, which, according to Templeton, was a guaranty of repayment of the amount of the investment.  Templeton contends that the guaranties are, in effect, unconditional promises to repay by AHF the amount of the investments.  But a guaranty is part of a three-party transaction and is a promise to answer for the repayment of a debt.  How does a guaranty bootstrap the Templeton investments into something more?  Templeton's construction makes the guaranties promissory notes.  By the very structure of each of the Templeton Deals, AHF received nothing in return for its guaranty.  In each instance, AHF is, per the deal, nothing more than a fractional interest holder in the limited partnership into which Templeton's investment dollars were to flow. The structure defies an interpretation that AHF received any consideration for its absolute, unconditional promise to repay Templeton's investment.

11.     Going beyond the labels and examining the actual terms of the instruments yields even more confusion.  The guaranties here do not actually provide that AHF guaranteed the amount of Templeton's investments.  Instead, as in the GOZ No. 1, Gray Ranch, and M2M3 deals, AHF guarantees obligations under "loan documents."  There are no loan agreements, promissory notes, or other instruments that can charitably be called "loan documents."  Still other guaranties refer to a guaranty of investments made before a date certain when in fact the investments were made after such date.  While this is an interpretation that can be harsh, it is yet

another example of how the guaranties fail to truly function as a typical guaranty. As for the M2M2 investment, there simply is no guaranty. The instrument that Templeton contends is a guaranty is actually nothing more than a chart describing the terms of the deal.

12.     As the deals mutated, they became murkier still. In the Walden II deal, Templeton asserts an investment amount of $3.5 million, a significant portion of which is based on credits "rolled over" to the partnership from other deals. But there is no evidence of substantive transactions behind this "rolling" from one partnership to another. Then, apparently as a way to effect a receipt of huge tax benefits, Templeton in two instances signed off on huge nonrecourse promissory notes, one for the sum of $924,371, the other for $2,513,028. Templeton had no explanation for this.

13.     To address the Templeton Claim and the Trustee's causes of action, the Court must first determine the real nature of the Templeton Deals. For this, the Court looks behind the form of the Templeton Deals and construes each deal as an integrated whole. The Court may "delve behind the form of transactions and relationships to determine the substance." *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991) (citations omitted). The partnership agreements, subscription agreements, guaranties, and other instruments evidencing each of the Templeton Deals were, within each deal, intimately intertwined. Analyzing one instrument is pointless without consideration of the others. *See id.* And, most important, the bundle of benefits and expectations Templeton received for each deal flowed from a single investment, i.e., Templeton's investments were not allocated as among the various benefits and promises flowing back to him.

14.     The Templeton Deals were, in substance, wildly beneficial to Templeton.  In return for entrusting his funds with Sterquell, Templeton received the following:

•     an interest in a simultaneously created limited partnership,

•     the promise of large returns, anywhere from 12% up to as much as 100%,

•     a promise of sorts from AHF to cover the investment,

•     the promise from Sterquell and the expectation on Templeton's part of extraordinarily generous tax benefits, ostensibly flowing from the investment in the particular investment vehicle (i.e., the partnership), and

•     payments to Templeton on account of the investments which triggered no obligation on his part to credit same against the amount of the investments.

15.     The "product" Templeton acquired as a result of his investment was not based on economic reality.  The Templeton Deals, according to Templeton, had no risk whatsoever, apart perhaps from the risk that Sterquell's investment scheme was a bogus, fraudulent enterprise.  The Templeton Deals were, as the cliché goes, "too good to be true."  Despite this, Templeton went along and never questioned any of the deals until after Sterquell's death.

16.     Templeton seeks, in particular, recovery from AHF, and thus the Court must characterize the Templeton Deals.  The Bankruptcy Code addresses real claims—secured, priority, administrative, unsecured—and equity interests.  "It does not have a category for strange, hybrid-type arrangements as exist here." *O'Cheskey v. Hous. for Texans Charitable Trust (In re Am. Hous. Found.)*, No. 11-02006, 2012 WL 4622310, at *11 (Bankr. N.D. Tex. Sept. 30, 2012).  The Court considers Templeton's "claim" against AHF.  The discrete legal basis for Templeton's claim are the guaranties issued by AHF.  But, as stated, the guaranties cannot be considered apart from the other transactions that arose in connection with the investments.  Templeton received a bundle of benefits that flowed from Sterquell and, by association, AHF.

- 25 -

Templeton entrusted real and substantial dollars with Sterquell; Sterquell no doubt pitched the

deals as valid. The circumstances here make recharacterization a threshold consideration.

17. The Fifth Circuit in *In re Lothian Oil Inc.*, 650 F.3d 539 (5th Cir. 2011), held that

bankruptcy courts have the ability to recharacterize debt as equity. *Id.*

> When a creditor files a timely claim, the Code states that "the court, after notice and a hearing, shall determine the amount of such claim ... and shall allow such claim in such amount, except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." 11 U.S.C. § 502(b). The Supreme Court has held that the "applicable law" is state law: "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979). As a result, "there is no reason why such [state law] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S. at 55, 99 S. Ct. at 918. Our analysis of "applicable law" under § 502(b) is therefore an application of state law, unless Congress has stated otherwise.
> Taken together, *Butner* and § 502(b) support the bankruptcy courts' authority to recharacterize claims. If a claim asserts a debt that is contrary to state law, the bankruptcy court may not allow the claim. Moreover, where the reason for such disallowance is that state law classifies the interest as equity rather than debt, then implementing state law as envisioned in *Butner* requires different treatment than simply disallowing the claim. The Fourth Circuit identified the inadequacy of traditional disallowance in noting that "[w]hen a bankruptcy court disallows a claim, the claim is completely discharged. By contrast, recharacterization is appropriate when the claimant has some rights via-a-vis the bankrupt." *In re Dornier Aviation, Inc.*, 453 F.3d 225, 232 (4th Cir.2006) (internal citation omitted; emphasis in original). These rights, fixed by state law, are not irrelevant to the court's decision to disallow a claim. To the contrary, recharacterizing the claim as an equity interest is the logical outcome of the reason for disallowing it as debt.

*Lothian Oil*, 650 F.3d at 543.

18. The Court looks to Texas state law to determine whether the Templeton Deals are

investments that create, at most, an equity claim or debt subject to treatment as an unsecured

claim. *See* 11 U.S.C. § 502(b); *see also Lothian Oil*, 650 F.3d 539. In this regard, Texas courts

have looked to the multi-factored tests from federal tax law cases. *Lothian Oil*, 650 F.3d at 544.

- 26 -

These include a 16-factor test as set forth in *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968); a 13-factor test from *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972); and an 11-factor test from *Jones v. United States*, 659 F.2d 618, 622 n.12 (5th Cir. 1981).

19.     As with other factor-driven tests, the Court reviews the evidence in light of all factors, "while realizing that the various factors are not of equal significance and that no one factor is controlling." *Lothian Oil*, 650 F.3d at 544 (quoting *Mixon*, 464 F.2d at 402). Additionally, the various factors "are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty*, 398 F.2d at 697.

20.     Factors considered are the following:

(1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Id.* at 696. Yet additional factors are the name of the instrument, if any, memorializing the deal, *Mixon*, 464 F.2d at 402, and the right to enforce payment of principal and interest, *Jones*, 659 F.2d at 622 n.12.

21.     On a more basic level, the Court notes that creditors and investors are distinguishable in the way they each view the solvency or insolvency of the enterprise with which they are dealing.  *In re Deep Marine Holdings, Inc.*, No. 10-03116, 2011 WL 160595, *5 (Bankr. S.D. Tex. Jan. 19, 2011).  For example, if the enterprise prospers, a creditor expects nothing more than repayment of its fixed debt. *Id*. In fact, the creditors rely on the *equity* provided by the company's investors. *Id*. at *6.  Investors, however, look to share in the profits to the exclusion of creditors.  *Id*. at *5.  The flip side of this expectation is the enhanced risk of insolvency borne by investors.  *Id*.  The subordination provisions of the Bankruptcy Code, both § 510(b) (mandatory subordination of damage claims arising from purchase of a security) and the absolute priority rule set forth at § 1129(b) of the Bankruptcy Code (providing that "unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated," *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009)), are said to arise from these basic expectations and, thus, the very nature of investments compared to loans.  Accordingly, the risk of the illegality in issuance of equity is properly borne solely by investors because "it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors."  *Deep Marine*, 2011 WL 160595 at *6 (quoting *SeaQuest*, 579 F.3d at 420).

22.     The intent of the parties here, as determined at the time of each deal, was that Templeton receive, in return for his investment, a range of benefits that far exceeded the value of his investment and thus was not limited to the amount of the investment.  The rates were not based on any market-based rate, and Templeton did not negotiate the interest rates on his

investments. He was to receive "interest," albeit at rates that potentially ranged to exceedingly high rates. In fact, the "return" was simply part of the larger sack of benefits. As for risk, the Court can assume that Sterquell certainly knew of the risks associated with each of the deals he concocted. Templeton, at best, was willfully blind to the risks.

23.     The identity and relationship between contracting parties is an important factor. If the parties do not negotiate at arms length, a court should be wary of them trying to "mold" a transaction into a financially amorphous product that can conveniently be either a loan or an investment. *See Fin Hay*, 398 F.2d at 697. Here, there was no actual negotiation. Sterquell and Templeton certainly had a close relationship. Sterquell was described by Templeton and others as brilliant and charismatic. Templeton, however, is a highly sophisticated, shrewd, and successful attorney. He knew the import of entrusting his funds with Sterquell and fully understood the basic legal nature of the instruments that were created as part of his investments. Given this, he was clearly complicit with Sterquell at the threshold of each of these deals. Sterquell knew these deals were not grounded in economic reality. As stated, Sterquell had to know they were risky; if Templeton did not also so realize, he certainly should have known. The Court accords Templeton the benefit of the doubt in this regard.

24.     Another factor concerns the amount of capital the recipient had at the time of the transaction. If the recipient was capitally thin, then the transaction weighs towards an equity investment. *See Jones*, 659 F.2d at 622; *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 751 (6th Cir. 2001). With each of the deals here, Templeton was contributing capital for a newly created limited partnership. AHF was an asserted non-profit entity that sat at the top of the enterprise that included dozens of for-profit companies or partnerships. Many of the deals orchestrated by

Sterquell were complex and, like the Templeton Deals, legally questionable. The Court can safely assume that AHF was capitally thin. It is also important to note that Templeton's investment funds were controlled by Sterquell (and, by association, arguably AHF) and used for whatever purpose he saw fit.

25.     The "risk involved" in the transaction typically considers the presence or lack of security. Absence of security is a "strong indication that the advances were capital contributions rather than loans." *See id.* at 752. Considering each of the Templeton Deals as a whole, there was no security behind the deals. In addition, Templeton made no risk assessment on the deals, apart from simply relying upon a nebulous promise that AHF somehow guaranteed his investment. Templeton essentially relied upon Sterquell to somehow orchestrate the deals so that Templeton would receive the expected basket of benefits. At bottom, Templeton relied upon the solvency of AHF and Sterquell's entire low-income housing enterprise. The flipside of Templeton's appetite for the basket of benefits is the extreme risk he bore through his participation.

26.     The arrangement's formal indicia are relevant to the inquiry. But, as explained, the formal indicia here are almost meaningless by virtue of their incoherence. For the most part, the Templeton Deals do not contain true debt instruments, collateral, set interest payments, actual repayments of principal, or other attributes indicative of an enforceable obligation to repay the sums invested. *See Geftman v. C.I.R.*, 154 F.3d 61, 68 (3rd Cir. 1998) (citing *Fin Hay*, 358 F.2d at 696).

27.     Templeton's position relative to other creditors regarding repayment of principal and interest is clearly distinguishable. Templeton expected huge returns and benefits; he was not looking for a repayment of a fixed sum, at a fixed rate, and at a certain time. The Templeton

Deals were far removed from true loans and debts, and Templeton is far removed from true creditors of AHF.

28.     Though Templeton obtained certain rights as a limited partner of the partnerships, he never manifested any desire to exercise rights as a limited partner.  This factor is not helpful.

29.     The Templeton Deals did involve returns denominated as interest.  But the rates were inflated, in some instances highly variable, and absurdly beneficial.  While Templeton would contend that there was some sort of maturity date on the Templeton Deals, the deals actually had, at most, a rough promise to repay the amount of the investment.  They contained no provisions addressing the consequences of AHF's (or the partnerships') failure to return the amount of the investment.  Besides, any discrete promise must be considered within the illusory nature of each deal as a whole.

30.     The evidence is not clear concerning the redemption rights of either Templeton or the involved partnerships (or AHF), but the Court notes that Templeton's interests may apparently have been redeemed as a way to accommodate the "rolling" of investments from one partnership into another.

31.     Finally, as was discussed above, the timing of the Templeton investments corresponded with the organization of the partnerships and the issuance of the partnership interests and guaranties from AHF.

32.     The Templeton Deals as a whole involved millions of dollars and huge passed-through tax write-offs.  They lacked economic substance and, as stated, frustrate legal analysis.  By any objective standard, they are highly questionable.  Templeton, however, chose not to question what Sterquell was doing with his money; he trusted Sterquell and turned a blind eye to

the strangeness of the deals as the benefits rolled in. Templeton's testimony at trial in response to

the Trustee's counsel's questions regarding the nature of Templeton's $450,000 investment in

M2M2 underscores the nature of the Templeton Deals:

> Q. [from McCartin] It says that you made an investment. Is that an equity investment that you made?
>
> A. Mr. McCartin, as I've said before and I'll say again, what this is, it is what it is. It is a document. It is a limited partnership agreement. It speaks for itself. It is a guaranty. It is a promise to pay. It is all of those things. It is what it is. And I'm not the expert on trying to use some word to pigeonhole the document or the agreement. . . . .
>
> Q. Okay. And then let's now go over to Article 6, the next page of the partnership agreement.
>
> A. Okay.
>
> Q. It says: Robert L. Templeton shall make a capital contribution of $450,000. Is that right?
>
> A. Yes, sir.
>
> Q. Okay. So I'm going to ask you, is it your position that this was a loan to M2M No. 2 or was this a - - equity contribution?
>
> A. This was a capital contribution.
>
> Q. Not a loan?
>
> A. I don't know.
>
> Q. You don't know the difference between a loan and an equity contribution?
>
> A. Well, I know the difference generally between a loan and an equitable thing that you're telling me. I – I am not going to try to play lawyer on what this is or what this is not.

*Transcript of Proceedings of Oct. 17, 2011* at 117 and 122.

33.     In assessing the above factors, and upon consideration of the very nature of the

investments compared to true loans, the Court concludes that Templeton's "investments" were

indeed equity investments and must be treated as such in this Bankruptcy Case. From the perspective of true, legitimate creditors of AHF, the inherent risks from such questionable deals should be exclusively with the one that blindly followed Sterquell's lead. Such characterization recognizes that Templeton put up real dollars and should have some rights vis-à-vis the bankrupt. *See Lothian Oil*, 650 F.3d at 543. "[It] is the logical outcome of the reason for disallowing it as debt." *Id.*; *see also AutoStyle Plastics*, 269 F.3d at 748–49.

## C.     Mandatory Subordination – Section 510(b)

34.     Section 510(b) of the Bankruptcy Code mandates subordination of "damages arising from the purchase or sale" of a security of the debtor or of an affiliate of the debtor. 11 U.S.C. § 510(b). "Any discussion of section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke, entitled *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973)." *SeaQuest*, 579 F.3d at 420 (quoting *In re Granite Partners, L.P.*, 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997)). In enacting § 510(b), Congress generally adopted the Slain and Kripke theory of allocating the risks of insolvency and the unlawful issuance of securities. *See* H.R. Rep. No. 95-595, at 195 (1977); *SeaQuest*, 579 F.3d at 420. Slain and Kripke's "subordination thesis . . . was premised upon the allocation of certain risks between investors and creditors." *SeaQuest*, 579 F.3d at 420. According to the theory,

> "[b]oth investors and creditors accept the risk of enterprise insolvency," but to differing degrees, as reflected in the absolute priority rule. While the creditor anticipates repayment of a fixed debt, the investor anticipates a potentially unlimited share of future profits. In exchange for this "unique right to participate in the profits," the investor risks the loss of his capital investment, which provides an "equity cushion" for the repayment of creditors' claims. In contrast, investors alone bear the

risk of illegality in the issuance of securities" because it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors.

*Id.* (citations omitted).

35.     In a solvent corporation, the priorities between creditors and shareholders are not significant. *Granite Partners*, 208 B.R. at 337.  However, "[w]hen a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion." *Id.* (quoting *In re Stirling Homex Corp.*, 579 F.2d 206, 213 (2d Cir. 1978) (quoting *Newton Nat'l Bank v. Newbegin*, 74 F. 135, 140 (8th Cir. 1896))).  Allowing an equityholder to assert an unsubordinated general unsecured claim against a debtor for damages arising from equityholder's investment would give the equityholder "the best of both worlds—the right to share in profits if [the debtor] succeeded and the right to repayment as a creditor . . . if it failed." *Liquidating Trust Comm. of the Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio)*, No. 12-3065 TEC, 2012 WL 5467754, at *6 (Bankr. N.D. Cal. Nov. 8, 2012) (quoting *In re VF Brands, Inc.*, 275 B.R. 725, 728 (Bankr. D. Del. 2002)).

36.     Section 101(49) of the Bankruptcy Code provides that a security includes any of the types of interests listed. *See* 11 U.S.C. § 101(49).  The use of "includes" means that the list is not exhaustive and that securities are not limited to the items listed in § 101(49). *In re Locke Mill Partners*, 178 B.R. 697, 701 (Bankr. M.D.N.C. 1995).  In addition, the Fifth Circuit found § 101(49)(A)(xiv), which provides for "other claim[s] or interest[s] commonly known as 'security,'" to be a "broad residual category." *SeaQuest*, 579 F.3d at 418.

- 34 -

37.     Templeton's unliquidated claim, based on fraud and other related theories, arises from the purchase of the product—the bundle of rights and expectations—from Sterquell and AHF that the Court has recharacterized as a series of equity interests. Templeton cannot assert additional claims to "lay aside the garb" of his equity interest and assume the role of a creditor. As an investor with unlimited upside potential, Templeton must bear the associated risk. Further, these interests are the type of "other claim[s] or interest[s] commonly known as 'security'" described by § 101(49)(A)(xiv). These equity interests fit into the Fifth Circuit's "broad residual category." In addition, the list in § 101(49) is not exclusive, and Templeton's interest is clearly an equity security interest even if it does not match any of the labels provided. Therefore, the claims fall within the requirements of § 510(b) and must be given the same priority as common equity interests.

38.     Templeton, assuming the facial integrity of the Templeton Deals, argues that he owns interests in various limited partnerships, not the debtor AHF. However, § 510(b) also applies to affiliates of the debtor. *See* 11 U.S.C. § 510(b). The Bankruptcy Code defines an affiliate as a "person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor." 11 U.S.C. § 101(2)©. A limited partnership agreement can serve to meet the requirements of an affiliate relationship in § 101(2)©. *In re Minton Group, Inc.*, 27 B.R. 385, 389 (Bankr. S.D.N.Y. 1983). In *Minton Group*, the court found that a limited partnership was an affiliate of the debtor where the debtor was the sole general partner and operated all the business and managed all of the property of the limited partnership under a limited partnership agreement. *Id.*

39. The operations and management of the general partnership that the court found to be an affiliate in *Minton Group* are similar to the operations and management of the limited partnerships in which Templeton invested. AHF (or a wholly owned subsidiary of AHF) was the sole general partner of the limited partnerships here in which Templeton invested. Further, just as the debtor in *Minton Group* operated and managed its affiliate's general partnership, AHF operated the business and managed all of the property of the limited partnerships—such as it was—in which Templeton invested. Even where an AHF subsidiary was the named general partner in a partnership agreement with Templeton, AHF (and, really, Sterquell) was the party in full control. Any intermediary did not affect AHF's (or Sterquell's) control. Therefore, even a construction of the Templeton Deals in a manner favorable to Templeton leads to the same result. As Templeton himself has stated, Sterquell, and by association, AHF, exerted total control over all aspects of the Templeton Deals. This control was formalized by the partnership agreements and the formalized relationship between the partnerships and AHF or a wholly owned conduit. The partnerships, under Templeton's construction, were affiliates of the debtor, AHF.

40. When an "investor" participates in nonsensical deals, especially investors of Templeton's expertise and sophistication, they must bear the risk inherent in such deals and such risks must characterize the real nature of the deals. It would be inherently unfair to place an investor such as Templeton at the same priority level as true creditors.

**D.    Remaining Issues in Light of Recharacterization and Subordination**

41.    The Court examines whether, in connection with the Templeton Deals, Templeton gave value and did so in good faith for his investments. He no doubt gave value in the amount of each of his investments. On the good faith question, the Trustee submits that Templeton's participation in Sterquell's illegitimate tax schemes defeats his good faith claim. The Court disagrees. As the Court has held in other actions, any complicity by Templeton with Sterquell concerning illegitimate tax deals did not defraud other creditors of AHF. *O'Cheskey v. Horton (In re Am. Hous. Found.)*, No. 10-02018, 2011 WL 4625349 (Bankr. N.D. Tex. Sept. 30, 2011), and *O'Cheskey v. Hous. for Texans Charitable Trust (In re Am. Hous. Found.)*, No. 11-02006, 2012 WL 4622310 (Bankr. N.D. Tex. Sept. 30, 2012). Templeton's investments well exceed the transfers.

42.    For the reasons set forth in the Court's supplemental conclusions of law in *O'Cheskey v. Housing for Texans*, 2012 WL 5430988 at *7, the Court concludes that the payments made to Templeton out of the AHF Development, Ltd. account within ninety days of the filing of the Bankruptcy Case were with funds from an account wholly controlled by AHF and, therefore, constitute payments from AHF.

43.    For the transfers to Templeton within ninety days of the bankruptcy filing, such transfers were made on account of an antecedent debt. *See O'Cheskey v. Hous. for Texans Charitable Trust (In re Am. Hous. Found.)*, No. 11-02006, 2012 WL 5430988, at *7 (Bankr. N.D. Tex. Nov. 7, 2012) (citing *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011)). AHF was insolvent within such ninety days and, if the transfers were allowed to stand, Templeton would receive more than he would receive in a chapter 7 proceeding. Such transfers therefore constitute voidable, preferential transfers under § 547(b) of the Bankruptcy Code.

44.     As the Court has determined that Templeton's claim is both recharacterized and, to the extent he asserts an unliquidated claim for damages, is subordinated under § 510(b), and that Templeton maintains the good faith defense contemplated by § 548(c), it is not necessary to address the balance of the issues before the Court.

45.     The issues here raise mixed questions of fact and law.  Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

### End of Memorandum Opinion ###